CHARLES E. GRAHAM, RECEIVER, vs. THE SOUTHINGTON BANK AND TRUST COMPANY.

Third Judicial District, New Haven, June Term, 1923.

WHEELER, C. J., BEACH, CURTIS, BURPEE and KEELER, Js.

A check drawn upon one bank and payable to the order of another, confers no authority upon the latter to pay the amount of the check in cash to an agent of the drawer; nor does the mere possession of the check by the agent warrant such payment.

The plaintiff, as receiver of a corporation, had accounts with the defendant bank and another bank, upon which he and C, but not E, were authorized to draw. E had authority to indorse checks for deposit, and to procure the cash necessary for pay-rolls, but only by checks payable to his order and signed by C or by the plaintiff. It was customary to transfer funds from the other bank to the defendant, by checks to the order of the defendant signed by the plaintiff or C. During a period of several months E presented to the defendant a total of fifty-six checks so drawn, and E, representing that he needed the cash for legitimate purposes, indorsed the checks with his own name and secured from the defendant the

Graham *v.* Southington Bank & Trust Co.

amounts called for by them, which amounts he converted to his own uses. *Held* that since E did not have authority, real or apparent, to obtain cash in such manner, the bank was liable to the plaintiff for funds so wrongfully disbursed. (*One judge dissenting.*)

A depositor is charged in law with such knowledge of errors in his account, as a reasonable examination of the bank statements and vouchers within a reasonable time after he has received them will disclose; and a failure to notify the bank of such errors may estop him from disputing the correctness of the account, at least to the extent that the bank is pecuniarily prejudiced by such failure; but the bank cannot urge such estoppel where its own ignorance of the true situation arises from its own negligence or wrongful act.

The defendant claimed that an examination of its monthly statements, or of the statements of the other bank, or both, would have disclosed E's defalcations to the plaintiff. *Held* that any duty to examine the statements of the other bank was owed only to it, and could not be relied upon by the defendant; that its own statements would not have shown the true nature of the transactions involved, but would only have shown a smaller amount on deposit than the plaintiff had ordered, and hence made doubtful any basis for estoppel; and that in any event, the bank's negligence in paying funds to one without authority to receive them, barred it from relying upon such estoppel.

The conclusion of law upon the facts found dictates the judgment to be rendered; and therefore if the only conclusion legally deducible from the facts found calls for a judgment for the plaintiff, a judgment for the defendant is erroneous and should be replaced by one for the plaintiff, without ordering a new trial.

Argued June 14th—decided July 27th, 1923.

ACTION to recover moneys alleged to have been deposited by the plaintiff in the defendant bank by transfer from another bank, brought to and tried by the Superior Court in New Haven County, *Webb, J.;* facts found and judgment rendered for the defendant, and in favor of the defendant to recover $265 upon its counterclaim. *Error; judgment to be entered for plaintiff for $6,395 and interest.*

The finding discloses the following facts, among others: The plaintiff in April, 1920, was appointed receiver of a corporation. He appointed one Warren D. Chase as his managing agent of the business, and

notified the defendant of this fact. The receiver carried deposit accounts in the Merchants National Bank of New Haven and with the defendant. He conferred authority on Chase to sign checks upon these accounts, and notified the defendant of this fact. About June 1st, 1920, Chase appointed one Herman W. Eyring auditor and head of the accounting department. It was the duty of the accounting department to take care of the posting of the books of the company, to indorse all checks received from third parties, to see that deposits were made in the various bank accounts of the receiver and to make out deposit slips in connection therewith, to procure the cash necessary for pay-rolls and for petty cash from the defendant bank, upon checks of plaintiff or Chase made payable to Eyring's order, to fill out the body of all checks to be signed by the plaintiff or Chase, and to get the monthly statements rendered by the banks and check same up with the books.

Eyring indorsed all incoming checks for deposit and determined whether such checks should be deposited in the defendant bank or in the Merchants National Bank of New Haven; Eyring determined when funds should be transferred from one bank to the other, and made out the checks for such transfer.

At no time prior to February 27th, 1922, did the plaintiff or his managing agent, Chase, notify the defendant of any limitation on the authority of Eyring with relation to his dealings with the defendant, other than that Eyring had no authority to sign checks in behalf of the plaintiff.

From time to time during the receivership, various amounts were drawn from the receiver's account with the Merchants National Bank of New Haven and deposited to the credit of his account with the defendant. The transfer of funds from the Merchants National Bank of New Haven to the defendant was

made by drawing a check, signed either by the plaintiff or Chase, upon the Merchants National Bank, made payable to the order of the defendant. Between March 29th, 1921, and August 9th, 1921, eleven checks so drawn, for sums averaging about $200 each, were duly presented to the defendant by Eyring for deposit and were accepted by the defendant and credited to the account of the plaintiff as deposits. From July 20th, 1921, to February 23d, 1922, fifty-six checks drawn by the plaintiff upon the Merchants National Bank of New Haven and made payable to the order of the defendant, were presented by said Eyring to the defendant and cashed by it. Eyring had no express authority from the plaintiff or Chase to procure cash on any of these checks, or to procure cash on any checks except those made payable to his own order. These checks were indorsed by Eyring on the back thereof before he presented same to the defendant and requested the cash thereon. Prior to July 20th, 1921, the defendant had never cashed for Eyring any check signed by the plaintiff or Chase, made payable to any one other than to Eyring.

The first of the checks thus fraudulently cashed by the plaintiff's agent, Eyring, was dated July 20th, 1921, and was for the sum of $50.

The plaintiff was not indebted to the defendant on July 20th, 1921, or at any other time from July 20th, 1921, to February 27th, 1922. There was no circumstance apparent to the defendant or existent in fact, requiring any transfer of funds from the plaintiff's account in the Merchants National Bank of New Haven to the plaintiff's account in the defendant bank.

The check for $50 dated July 20th, 1921, did not indicate on its face the purpose for which it was intended, and was accompanied by no deposit slip or other written memorandum indicating such purpose; the sole infor-

mation given to the defendant as to the purpose of the check was given orally by the plaintiff's agent, Eyring, with whom alone the defendant customarily dealt in all matters affecting the plaintiff's account. This check when returned by the Merchants National Bank plainly showed both by the cash stamp on its face and by the personal indorsement of Eyring on its back, that the defendant had cashed the same and delivered the cash to the plaintiff's agent, Eyring.

Subsequent to the cashing of the check dated July 20th, 1921, the first statement rendered by the defendant to the plaintiff was a statement rendered on or about September 1st, 1921, which was the statement of the plaintiff's account with the defendant for the months of July and August, 1921.

No instructions as to these checks were ever given to the defendant except the oral instructions given by the plaintiff's agent, Eyring. Each of the fifty-six checks, with two exceptions, when returned by the Merchants National Bank, plainly showed that all of the fifty-six checks were cashed by the defendant without any direct inquiry being made of the plaintiff personally, or of Chase personally, as to the authority of Eyring to so cash them.

On or about the first of every month from July 1st, 1921, to March 1st, 1922, monthly statements and vouchers setting forth the checks debited and the deposits credited to the account of the plaintiff were sent to the plaintiff by the defendant.

None of the monthly statements were ever seen or examined by the plaintiff personally, or by said Chase personally, until shortly prior to February 27th, 1922.

Even a very casual comparison of the checks thus signed by the plaintiff or his managing agent (or of the stubs for the same) to effect a transfer of funds from the plaintiff's account in the Merchants National

Bank of New Haven to the plaintiff's account in the defendant bank, with the deposits credited to said account in the defendant bank during any month, would have disclosed that many of the fifty-six checks had not been deposited to the account. Even a casual examination of the canceled checks returned monthly by the Merchants National Bank of New Haven would have disclosed that the fifty-six checks were being cashed by Eyring.

Neither the plaintiff nor his managing agent, Chase, prior to February, 1922, ever examined or made any effort to examine any of such bank statements rendered by the Merchants National Bank of New Haven or by the defendant, or any of the canceled checks returned by either of the banks; but left the examination of the same wholly to Eyring; and in no manner supervised or attempted to supervise such examinations by Eyring.

On or about February 5th, 1922, Chase, as a result of reports that he had heard as to Eyring's spending large sums of money, made an attempt to discover if there was any way in which Eyring had been getting money to which he was not entitled.

On March 31st, 1922, the plaintiff made demand in writing upon the defendant for the payment to him by the defendant of the sum of $6,395, the total amount of the fifty-six checks, but the defendant refused to pay and never has paid the same to the plaintiff.

The court drew the following conclusions from the facts: "1. The course of conduct between the plaintiff and the defendant prior to July 20th, 1921, as set forth in the finding, justified the defendant in the conclusion that said Eyring was a trusted employee of the plaintiff, charged with the performance of all duties in connection with the plaintiff's bank accounts except that of actually signing checks. 2. Under the circumstances as set forth in the finding, the amount of the first check

presented by said Eyring to be cashed would not indicate that it was designed to prevent, or make good, an overdraft, or to transfer funds from the bank upon which it was drawn to the plaintiff's account with defendant. 3. Because of the continued course of conduct established prior to July 20th, 1921, between the plaintiff and the defendant as set forth in the finding, defendant was not negligent in cashing the first check presented on Eyring's request. 4. Defendant was not negligent in cashing any of the checks set forth in Exhibit A. 5. Eyring's irregular conduct in conducting the financial affairs of the plaintiff would have been disclosed by an examination by the plaintiff of the cancelled vouchers returned from the Merchants National Bank of New Haven. 6. Eyring's irregular conduct in conducting the financial affairs of the plaintiff would have been disclosed by an examination and comparison by the plaintiff of the disbursements and receipts cash-books of the plaintiff. 7. The exercise of ordinary prudence and reasonable oversight by the plaintiff ought to have disclosed Eyring's frauds long before they were disclosed. 8. The loss arising from Eyring's dishonesty did not result in any degree from the defendant's negligence. 9. The loss arising from Eyring's dishonesty resulted solely from the unbounded confidence reposed in him by the plaintiff, and the failure of the plaintiff to exercise such prudent oversight of his conduct as would have exposed his wrong-doing."

*Ralph H. Clark,* for the appellant (plaintiff).

*Ralph O. Wells,* for the appellee (defendant).

CURTIS, J. The plaintiff is a receiver of a manufacturing corporation which was doing business in Southington, Connecticut. He was appointed in April,

1920, and under order of court was continuing the business in Southington. He conducted the business principally through a managing agent, one Warren D. Chase, to whom he gave authority to sign ·checks upon the deposit accounts of the receiver in the Merchants National Bank of New Haven, and the defendant bank of Southington. The defendant in May, 1920, was notified of such appointment of Chase and of such authorization as to signing checks.

The plaintiff employed one Herman W. Eyring in the business as auditor and as the head of the accounting department, and notified the defendant bank that Eyring was not authorized to sign checks upon his deposit account.

On July 20th, 1920, the plaintiff, by himself or Chase, drew a check for $50 on the Merchants National Bank, payable to the order of the defendant bank, with intent to deposit it in the plaintiff's account in the defendant bank, and thereby transfer funds from the custody of the Merchants National Bank to his account in the custody of the defendant bank. He gave the check to Eyring to deposit in the defendant bank, and gave Eyring no other authority as to the check. Eyring did not prepare a deposit slip and deliver the check for deposit to the account of the plaintiff, but intending to defraud, personally indorsed the check and presented it to the defendant bank and represented that the plaintiff had directed him to get cash for the check for pay-roll use. The defendant accepted Eyring's statement as true, and made no investigation to discover whether Eyring's representation as to his authority was true in fact, although the business conducted by the plaintiff was in the same town as the bank and readily accessible. The defendant thereupon gave to Eyring the money represented by the check, and he converted it to his own use.

Subsequently fifty-five other checks dated respectively, from August 1st, 1921, at various dates in each month until February 3d, 1922, were in like manner drawn by the plaintiff for deposit in the defendant bank, and given to Eyring to deposit. Eyring by the use of the same fraudulent representation induced the defendant bank to give him cash for these checks, which he converted to his own use. The sum thus secured by Eyring totaled $6,395. The defendant duly presented these checks to the Merchants National Bank and they were paid to the defendant. The plaintiff has demanded the sum so received by the defendant, but the defendant has refused to pay it to the plaintiff.

As far as the legal relations between the parties are concerned, it is immaterial that the defendant paid the money to Eyring before it collected it from the Merchants National Bank. If the bank was legally justified in paying the money to Eyring, it could do it by what is called "cashing the checks" at once or by first collecting the money from the Merchants National Bank and then paying it to Eyring. If the plaintiff gave Eyring, either directly or by implication, authority to get cash from the defendant by use of these checks for pay-roll or any other purpose, the bank was justified in paying Eyring the money as it did. If, however, the plaintiff did not give Eyring such authority, either expressly or by implication, then the bank, having collected the amount represented by the checks from the Merchants National Bank, is accountable to the plaintiff for it, unless by ratification or estoppel the plaintiff is barred from recovering it.

Eyring had no direct authority to get cash from the bank on the checks in question. It is not claimed that he was a general agent of the plaintiff, but it is claimed that by the conduct of the plaintiff he had given him apparent authority to get cash of the defendant upon

these checks, and further, that the plaintiff had knowledge actual or imputed that Eyring was securing cash from the bank upon these checks, and because he failed to convey this knowledge to the bank he is equitably estopped to deny Eyring's authority or the validity of the bank's payments to Eyring on these checks.

It is claimed that the placing by the plaintiff of these checks, drawn payable to the defendant, in Eyring's hands, gave him apparent authority to secure cash from the defendant upon them. The question of what authority the mere possession of such checks gives an agent of the drawer in relation to a bank payee, has been treated fully and authoritatively in a case presenting the identical situation. In *Sims v. United States Trust Co.*, 103 N. Y. 472, 9 N. E. 605, the court speaks as follows as to what is legally imported between the drawer and the payee bank when such a check is presented by an agent of the drawer to the bank: "The check upon its face imported the ownership of the moneys represented in it" by the drawer, "and his desire that its custody should be transferred from" the bank holding it to the payee bank. "This did not warrant" the payee bank "in supposing that" the drawer "thereby intended to pay" the face of the check to the agent, or "place him for any purpose in possession of the fund. If he had so intended, the check would have been made payable" to the order of the agent, "and there would have been no need of the agency" of the payee bank "in the transaction. The use of the bank" as payee of the check indicated the drawer's intention to lodge the moneys in its custody and place them under its control, and nothing further than this was inferable from the language of the check. The check, by its terms, authorized the payee bank "to withdraw from the" drawee bank "a certain sum for a purpose not disclosed" by the terms of the check,

"but fairly inferable from, the nature of the" payee bank's business, particularly if the drawer was already a depositor of the payee bank. The payee bank "could have refused to receive the deposit, or act as" the drawer's "agent in transferring the funds from one custodian to another; but having accepted the office of so doing, it was bound to keep" the drawer's "moneys, until it received his direction to pay them out. The language of the check making the funds payable only upon the order of the" payee bank "imposed upon it the duty of seeing that they [the funds] were not, through its agency, improperly disbursed after it had received them. They could not safely pay out such funds except under the direction of" the drawer of the check, "their lawful owner." In *Bristol Knife Co.* v. *First Nat. Bank*, 41 Conn. 421, 425, in an analogous situation, we have in substance laid down the same legal principles.

It thus appears that checks drawn as the fifty-six checks in question were drawn, are not of the same import as checks drawn to "Bearer" or to "Cash," nor do such checks clothe the holder or bearer of them with apparent authority to convert them into cash and take the cash into his own custody. Therefore, Eyring in securing money from the defendant bank by asking it, without authority, to pay him the face of these checks, was in effect securing money by mere request. Examining the situation presented in the instant case in the light of these legal principles, it follows that when Eyring presented himself at the defendant's banking-house with these checks payable to the defendant's order and the defendant bank received them, it became custodian of the funds subject to the plaintiff's direction in respect to them, and if it failed to keep the funds represented by these checks on deposit subject to the plaintiff's order, it must justify its conduct because

of directions which it received from the plaintiff. If Eyring assumed to convey directions from the plaintiff authorizing the defendant to pay over such funds, and the defendant followed such directions assuming that they were in fact given by the plaintiff and not investigating their truth, it did so at the peril of discovering that the plaintiff never gave such directions, and thereby of subjecting itself to liability for the funds misapplied. The defendant does not deny that it collected the money represented by the fifty-six checks from the Merchants National Bank, and that it refuses to turn the money over to the plaintiff. The defendant could not safely pay out such funds except under the direction of the plaintiff. This the defendant never received unless the proof which we shall now consider amounts to or is equivalent to such a direction.

The defendant in its answer claims, in effect, that Eyring in receiving cash from it for these checks was acting as agent of the plaintiff, either because such conduct was within the apparent scope of his authority, or because his conduct was, in the eyes of the law, ratified by the plaintiff. We have already shown that the mere possession of these checks did not give Eyring apparent authority to secure cash for them. Did the course of dealing between the plaintiff and the bank in relation to Eyring give him apparent authority to "cash" these checks? A survey of the facts found, discloses that the authorized acts done for the plaintiff by Eyring before July 20th, 1921, or thereafter, were not such as would legally or logically support the conclusion that Eyring was an agent of the plaintiff by implication, clothed with apparent authority by the acts and conduct of the principal, to secure money from the defendant bank without a check legally payable to him. *Bristol Knife Co.* v. *First Nat. Bank*, 41 Conn. 421, 426. The finding discloses that before July 20th,

1921, Eyring had never secured money from the defendant bank except upon checks of the plaintiff made payable to him, and further that on several occasions Eyring had brought to the defendant checks drawn to its order by the plaintiff as the fifty-six checks were drawn, and that they had in all cases been credited to the plaintiff's account. Further, the notice given to the bank that Eyring had no authority to draw checks on the deposit accounts, disclosed that he was not agent with authority to do whatever the plaintiff could do in regard to the deposit account. This notice was equivalent to notice that Eyring could not secure the plaintiff's money on deposit in the defendant bank, except by use of checks of the plaintiff or Chase in due course, or by other directions from them.

The defendant has urged that an agency to secure cash upon the fifty-six checks has been created by estoppel. It is elementary that agency by estoppel "cannot be invoked in favor of one who has relied upon the 'alleged agent's declaration of his authority, and made no further inquiry." 2 Corpus. Juris, 465, § 73. The defendant further claims that the plaintiff has ratified by estoppel the conduct of Eyring in securing cash on the fifty-six checks from the defendant, because he received notice on September 1st, 1921, when the defendant rendered its statement and vouchers for July and August, 1921, that the check of July 20th, 1921, and several similar checks drawn in August to the order of the defendant bank, had not been credited to his account in accord with his intent and directions to Eyring. It is no doubt the law that a depositor is charged with such knowledge as to errors in the account as a reasonable examination of the bank statements and vouchers received by him, within a reasonable time after their receipt, will disclose, and that a failure to notify the bank of any errors, of which he is thus charged

with knowledge, may estop him from disputing the correctness of the account, at least to the extent that the bank is pecuniarily prejudiced by his failure to give it notice of the errors. But if the ignorance of the bank as to the errors in the account arose from its own negligence in relation to the account, then it cannot claim that the depositor is estopped because he did not dispel an ignorance which in contemplation of law did not exist, because the bank in the exercise of reasonable care should have had knowledge of the erroneous state of the account. *Leather Mfrs. Nat. Bank* v. *Morgan,* 117 U. S. 96, 6 Sup. Ct. 657. The subject is considered at length, with abundant citation of authorities, in notes found in Lawyers Reports Annotated, 1915D, p. 741, and 17 Amer. & Eng. Anno. Cases, p. 122.

The court in its conclusions Nos. 1, 2 and 3, may intend to state what it does not state directly, that Eyring had apparent authority to get money from the defendant bank upon request, without a check signed by the plaintiff or Chase. We have already stated that such a conclusion, if made, was, under the subordinate facts, illegally or illogically made, and so erroneous. Under the finding, therefore, Eyring, in cashing the fifty-six checks in question, did so without authority express or implied.

The defendant delivered to the plaintiff a statement with vouchers on September 1st, 1921, covering its transactions as to the plaintiff's account during July and August. It claims that this statement, if examined with reasonable care, would have disclosed the unauthorized use that Eyring was making of checks of the plaintiff drawn against the Merchants National Bank, made payable to the defendant bank, and delivered to Eyring for deposit. The statement informed the plaintiff of the state of his debit and credit account as the bank claimed it. It gave a list of amounts paid on

checks drawn against his account, and also the amounts of the deposits made at various dates. It would indicate to the plaintiff that the deposits credited were less than those which he had ordered to be made. It would not disclose on its face how the shortage arose. Whether it arose because Eyring had converted cash, if any, which it was his duty to deposit, or because he had converted the checks of customers in his hands for deposit, or whether by mistakes or the mishandling of his account within the bank. The vouchers returned to the plaintiff with the statement would not include any of the checks in controversy drawn on the Merchants National Bank. It must be borne in mind that the mere failure of the plaintiff to examine the statements of the Merchants National Bank and acquire knowledge of the state of that account, and to observe the marking on the checks in question returned by that bank, is not a failure to do anything of which the defendant can complain. Such obligation as rested on the plaintiff to examine the monthly statements and vouchers of the Merchants National Bank to free himself from possible loss arising from an estoppel by conduct, was an obligation in reference to that bank alone and not in reference to mankind in general. The negligence causing an estoppel must be in the transaction itself. Bigelow on Estoppel (6th Ed.) p. 712 *et seq.* The statements of the defendant bank, with their accompanying vouchers, made to the plaintiff on September 1st, 1921, and thereafter, would disclose to the plaintiff on their face when compared with a true account, a shortage on the credit side of the deposit account. It might be claimed that this put the plaintiff on inquiry and would reasonably lead to a survey of the checks returned by the Merchants National Bank, and further, that if he had informed the bank of the shortage, the bank might have, by inquiry,

discovered that in placing its reliance on Eyring's declaration of his authority to cash the checks in question, it had been misled. This discussion indicates that it is a question, not without difficulty, as to what a reasonable examination of the defendant's statements and vouchers would have disclosed as to the source of the shortage on the credit side of the plaintiff's account. It is universally held that a bank is not entitled to claim an estoppel against a depositor in regard to the examination of bank statements, unless the bank was free from negligence in regard to failure to acquire the information, ignorance of which it claims the depositor was equitably bound to dispel because of knowledge acquired by him in examining its statements and vouchers. See note in L. R. A. 1915D, p. 741, cited above. It is a fundamental rule in the law of estoppel by conduct, that the person claiming an estoppel "must show that he exercised due diligence to know the truth, . . . and that he was destitute not only of knowledge of the true state of things, 'but also of any convenient or available means of acquiring such knowledge.'" *Weidemann* v. *Springfield Breweries Co.*, 78 Conn. 660, 664, 63 Atl. 162; *Williams* v. *Wadsworth*, 51 Conn. 277; Bigelow on Estoppel (6th Ed.) p. 681 *et seq.*, where this matter is discussed.

"As a corollary to the proposition that the party setting up an estoppel must have acted in reliance upon the conduct or representation of the party sought to be estopped, it is as a general rule essential that the former should not only have been destitute of knowledge of the real facts as to the matter in controversy, but should also have been without convenient or ready means of acquiring such knowledge. One relying on an estoppel must have exercised such reasonable diligence as the circumstances of the case require. If he conducts himself with a careless indifference to

means of information reasonably at hand, or ignores highly suspicious circumstances which should warn him of danger or loss, he cannot invoke the doctrine of estoppel." 21 Corpus Juris, 1129, § 131. The defendant claims, in substance, that from a reasonable examination of its statements, the plaintiff might have been led into an examination of its accounts with the bank and discover that Eyring had been exercising an unauthorized authority in cashing the checks in question. If the bank knew this already by actual or constructive knowledge, the failure of the plaintiff to supply information, which the bank already had in contemplation of law, could not equitably be held a source of prejudice to the bank. When the bank was dealing with Eyring as to this class of checks and cashing them, there was no basis for a reasonable inference of apparent authority, and it relied implicitly upon his statement that he had authority to get cash from the bank on these checks. The bank by relying upon the statement of Eyring as to his authority without verifying it, when it had such convenient and ready means of acquiring such knowledge, is deemed in the eyes of the law to have had at all times the knowledge which it could have so acquired, that Eyring did not have the authority he claimed. To state it otherwise, the bank by its negligence is estopped from asserting its ignorance of the information, which it claims should be imputed to the plaintiff and the possession of which without imparting it to the defendant, it claims should bar the plaintiff from the recovery of money which plaintiff put in its custody and which the bank with the utmost disregard of its duty to a depositor negligently paid away.

The purport of these principles of the law of estoppel as applicable to the facts of the case, is that the plaintiff by reason of the imputed or constructive knowledge

Graham *v.* Southington Bank & Trust Co.

of the defendant that Eyring was without authority to secure cash upon any of the fifty-six checks in controversy, was not bound in equity to take better care of the property of the defendant than the defendant itself cared to take. The law of equitable estoppel by conduct based on imputed knowledge, for obvious equitable reasons is not accompanied by refinements in the nature of a last-clear-chance doctrine.

The gist of the plaintiff's reasons of appeal and contentions is, that upon the facts found the conclusions of the court, either specifically found or involved in the judgment rendered, and forming the essential basis of of the judgment for the defendant, are conclusions that cannot legally or logically be drawn from the subordinate facts, and are therefore errors in law; and that, under the facts found and such conclusions as can be legally or logically drawn from them, judgment must be rendered for the plaintiff. The foregoing discussion discloses that the reasons of appeal are well taken.

In *Coughlin* v. *McElroy,* 72 Conn. 444, 44 Atl. 743, in reversing a judgment and ordering a judgment for an appellant upon the facts found appearing in the record, we said (p. 446): "The reversal of a judgment annuls it, but does not necessarily set aside the foundation on which it rests. This foundation may be sufficient to support a judgment of a different kind, and may be such as to require it. . . . If the error was one in drawing a wrong legal conclusion from facts properly found and appearing on the record, it would be an unnecessary prolongation of litigation to enter again on the work of ascertaining them. . . . In every trial which may result in an appeal to this court, it is the duty of each party, so far as he is able, to see that whatever is material to support his contentions is proved and found."

There is error, the· judgment is reversed and the Superior Court is ordered to enter judgment for the plaintiff to recover $6,395, with interest from March 31st, 1922.

In this opinion WHEELER, C. J., BURPEE and KEELER, Js., concurred.

BEACH, J. (dissenting). The defendant bank informed the receiver, by monthly statements of account, that his agent was not depositing these fifty-six checks to the credit of the receiver's account. About six months after the first of these accounts had been rendered, the consequent increasing discrepancy between the receiver's balance as reported by the bank, and the balance as it should have been if the checks had been deposited, amounted to $6,934, and up to that time the receiver made no response to the statements except by his apparent acquiescence in the accounts as stated. In the meantime the defendant might reasonably suppose that in the usual course of business the plaintiff was also receiving similar statements from the Merchants National Bank of New Haven accompanied by canceled checks, and was therefore informed from a second source that his agent was not depositing the checks, but was cashing them.·

Because these bank statements are rendered for the very purpose of inviting criticism or acquiescence, I am of opinion that less than six months' apparent acquiescence by the receiver in the course of his agent's dealing with the defendant bank, after the defendant had a right to believe that the receiver was informed of it, is enough to confer an apparent authority on the agent to continue it.

Under the older usage of stating the account by writing up the depositor's pass-book, it was generally

held that the depositor was bound to examine the statement within a reasonable time, and his failure to object was treated as an acquiescence in the account stated. *Leather Mfrs. Nat. Bank* v. *Morgan,* 117 U. S. 96, 6 Sup. Ct. 657; L. R. A. 1915 D, 741, and cases cited in the note. By analogy, the same rule should apply to the later usage of rendering monthly statements accompanied by vouchers. It is true, as the opinion states, that the depositor was not estopped by such acquiescence from correcting the account as to errors caused by the bank's negligence, and the cases cited in the opinion apply that rule to the negligent payment by the bank of forged and raised checks; but when the bank had acted on the actual or apparent acquiescence, without negligence, to its injury, the depositor was estopped. See *Leather Mfrs. Nat. Bank* v. *Morgan, supra.* And this was so when the depositor had turned the pass-book over to an unfaithful clerk for examination and approval. *Leather Mfrs. Nat. Bank* v. *Morgan, supra.*

Applying that rule to this case, I agree that in the first instance the defendant bank was negligent in permitting Eyring to cash checks which were on their face mere transfers of funds intended for deposit. The negligence consisted in assuming from the agent's own representation that he had authority to do so for payroll purposes, without first making due inquiry of the principal.

But as each successive statement was rendered it plainly showed an increasing deficiency in the credit balance corresponding exactly in amount with the sum of certain checks properly drawn by the receiver on the Merchants National Bank of New Haven and given to Eyring for deposit in the defendant bank. They were not being deposited, and the only reasonable alternative was that Eyring was cashing them. I

think that fact was sufficiently evident on the face of the statements rendered by the defendant, without the conclusive proof afforded by the canceled checks themselves when returned to the receiver by the Merchants National Bank.

If the defendant's statements were not self-explanatory, then I think the receiver's duty to examine them with reasonable care required him to look at the canceled checks when returned by the Merchants National Bank to see why they had not been credited to his account by the defendant.

However that may be, the question whether the defendant was continuously negligent in permitting Eyring to cash these checks depends on all the surrounding circumstances, and one important fact is that the defendant had a right to assume that the checks in question would be returned to the receiver, bearing on their face conclusive proof that Eyring had cashed them.

The extent of Eyring's authority was a matter peculiarly within the receiver's knowledge, and as the practice of cashing these checks assumed the proportions of a regular course of dealing, there came a time when the receiver's apparent acquiescence would justify an ordinarily prudent banker in believing, and in acting on the belief, that the receiver had, as Eyring claimed he had, given the agent authority to cash these checks for pay-roll purposes.

On that ground alone I dissent.