BULLITT COUNTY BANK, Appellant,

v.

PUBLISHERS PRINTING COMPANY,
INC., Appellee.

PUBLISHERS PRINTING COMPANY,
INC., Cross-Appellant,

v.

BULLITT COUNTY BANK,
Cross-Appellee.

Nos. 83–CA–2201–MR, 83–CA–2452–MR
and 80–CI–05476.

Court of Appeals of Kentucky.

Sept. 7, 1984.

Rehearing Denied Nov. 9, 1984.

Discretionary Review Denied
Feb. 21, 1985.

Thomas C. Carroll, Carroll, Steinfeld & Longmeyer, Louisville, for appellant/cross-appellee.

Ronald L. Gaffney, Maurice A. Byrne, Jr., Barnett & Alagia, Louisville, John B. Spainhour, Shepherdsville, for appellee/cross-appellant.

Before CLAYTON, LESTER and WILHOIT, JJ.

**CLAYTON, Judge.**

This appeal is from a summary judgment in favor of Publishers Printing Company, Inc., (Publishers) against Bullitt County Bank (Bank). Final judgment awarded Publishers $147,480.85 plus costs against the appellant bank. The ultimate issue to be resolved is whether summary judgment was proper. Intermediate questions necessarily include (1) determining the standard of care to be exercised by the bank when handling checks drawn to its order by a drawer not indebted to that bank and (2) establishing the effect of alleged negligence upon the part of the drawer (Publishers) in its handling of those same checks prior to their tender to the bank and (3) prejudgment interest raised by the appellee Publishers as cross-appellant.

Publishers Printing Company, Inc., is a closely held printing corporation located in Shepardsville, Bullitt County, Kentucky. The majority of its voting stock, 44,600 shares of the 50,000 shares of issued common voting stock, is owned by Frank E. Simon (Simon), President of Publishers. The other two principal officers of the company are James C. Haberman, vice president and secretary, and Karl Gerhard, Treasurer. Simon, Haberman, and Gerhard composed the Board of Directors during the entire period involved in this litigation.

Since 1964, Publishers had employed William B. Young. Characterized by the parties at different times as a "chief clerk," "officer manager," and "trusted employee," Young's primary duties at Publishers appear to have consisted of depositing checks to Publishers' accounts; cashing small checks which he was required to endorse; and ensuring that account balances were maintained. Depositions of the bank's tellers indicate that the activities Young conducted at the bank consisted primarily of making deposits. Young was not authorized to cash checks payable to Publishers, nor to endorse or divert them. The bank did not permit him to negotiate loans for Publishers, nor to write checks on its

accounts, nor transfer monies from Publishers' accounts.

However, from October 22, 1975, through January 18, 1980, Young began presenting checks at the bank drawn on Publishers' accounts made payable to the bank. Apparently it was a common, though questionable, practice for Simon to leave pre-signed blank checks in Young's possession to which Haberman or Gerhard would co-sign as a matter of routine. Young would then present these checks at the bank requesting that it exchange them for cashier checks made payable to Citizens Fidelity Bank, a Louisville Bank where Young maintained a private account.

The common, and equally questionable, policy of the bank with regard to checks made payable to it and drawn by known depositor's account to exchange for cashier checks was to negotiate these checks without requiring endorsement. None of the tellers handling these transactions questioned Young about his authority to make such exchanges. Nor did any Bank employee notify Publishers or question it concerning Young's departure from his ordinary routine of making deposits. They apparently assumed that Young was involved in Publishers' business with Citizens.

During the period of time involved, annual audits of the records and bookkeeping of Publishers were performed by the national accounting firm of Touche, Ross & Co. through their employee, Whelan, who in 1979 became employed by Publishers. Simon also made it a practice to examine the monthly statements provided by the Bank. Neither Touche, Ross & Co. nor Simon discovered the embezzlement during its commission. Neither raised questions about the checks being made payable to the bank, nor the peculiarity that several of the checks were written ostensibly to purchase postage, which Publishers routinely bought directly from the post office in Louisville, Kentucky.

On June 6, 1980, the proverbial "walls came a tumblin' down." Publishers filed a complaint in Jefferson Circuit Court against Young. A subsequent first amended complaint was later filed including First National Bank, Bullitt County Bank, and Citizens Fidelity Bank & Trust Company as additional defendants. Allegations of the amended complaint relating to Bullitt County Bank are that the Bank negligently violated its duty and failed to exercise ordinary care in handling the checks, damaging Publishers in the amount of $350,000 plus punitive damages of $100,000. Bullitt County Bank by answer denies all allegations of duty, negligence, and failure to exercise ordinary care. Affirmative defenses of apparent authority, estoppel, laches, negligence, and statute of limitations have also been raised. Both Publishers and the bank moved for summary judgment in their behalf following the dismissal of First National and Citizens Fidelity upon agreed order of settlement. On June 30, 1982, the Jefferson Circuit Court granted summary judgment on behalf of Publishers thus bringing about this appeal.

## I. THE STANDARD OF CARE OF THE BANK.

 We begin with an analysis of the nature and extent of the duty owed to Publishers by Bullitt County Bank. In brief, that duty is to exercise good faith and use ordinary care in handling the accounts of its customers. *Bank of Southern Maryland v. Robertson's Crab House, Inc.,* 39 Md.App. 707, 389 A.2d 388, 391 (1978) [citing *Taylor v. Equitable Trust Co.,* 269 Md. 149, 304 A.2d 838 (1973)]. While the Uniform Commercial Code (U.C.C.) as adopted in Kentucky does not expressly state that a collecting or payor bank is liable for negligently paying on an instrument, numerous U.C.C. provisions indirectly indicate that this is so. These begin with KRS 355.1–103 incorporating the common law rules of negligence into the U.C.C. § 3–419(3); KRS 355.3–419(3) speaks also of limiting recovery against collecting banks for conversion where they have acted in good faith and followed reasonable commercial standards. Section 3–406, dealing exclusively with material alterations and unauthorized signatures, guar-

antees a payor, who has paid in good faith and in accordance with reasonable commercial standards of his business, protection from assertions of material alteration or unauthorized signature by parties whose negligence substantially contributed to his injury. Finally, under § 4–103(1) a bank may not disclaim its own lack of good faith or failure to exercise ordinary care, thus implying that such duties do indeed exist.

Outside the provisions of the U.C.C., further indication of the Bank's duties of good faith and ordinary care can be found in the inherently contractual relationship of a bank to its depositor. *See Hileman v. Hulver*, 243 Md. 527, 221 A.2d 693 (1966). "Implicit in the contract is the duty of the bank to use ordinary care in disbursing the depositor's funds." *Bank of Southern Maryland v. Robertson's Crab House, Inc., supra* 389 A.2d at 392 [citing *Commonwealth Bank of Baltimore v. Goodman*, 128 Md. 452, 97 A. 1005 (1916)].

In situations such as that arising between Publishers and the Bullitt County Bank, the bank's duty of ordinary care has been effectively summarized,

> Where a check is drawn to the order of a bank to which the drawer is not indebted, the bank is authorized to pay the proceeds only to persons specified by the drawer; it takes the risk in treating such a check as payable to bearer and is placed on inquiry as to the authority of the drawer's agent to receive payment. 9 C.J.S. *Banks and Banking* § 340 (1938).

This general proposition enjoys the unwavering support of a vast body of judicial opinion originating both before and after the creation of the U.C.C. *See Bank of Southern Maryland, supra* 389 A.2d at 393 (citing numerous opinions so holding). We have yet to discover a single decision holding to the contrary, nor has one been cited to us. The decisions relied upon by the Bank all involve altered or improperly signed checks and are therefore inapplicable to the controversy at hand. *See Smith v. First National Bank of Horse Cave*, Ky., 217 Ky. 471, 290 S.W. 346 (1927);

*Winn v. First Bank of Irvington*, Ky.App., 581 S.W.2d 21 (1979).

There is little doubt, given the law and the facts involved, but that the Bank violated its duty of ordinary care. No employee of the Bank ever notified Publishers of Young's strange departure from his regular banking duties following 1975. The tellers' deposition testimony indicates that they simply assumed he was acting on behalf of Publishers. Mechanically following Bank policy these employees customarily exchanged unendorsed checks drawn to the order of the Bank without question. Such custom has been judicially labeled unreasonable and condemned. *See Main Belting Co. v. Corn Exchange Nat'l. Bank & Trust Co.*, 325 Pa. 168, 188 A. 865, 868 (1937). As *Main Belting Company, supra*, 188 A. at 868 explains,

> The manner in which Smith [the employee embezzler] was able to use these checks without earlier discovery illustrates its unreasonableness [the bank's check policy]. The checks drawn on defendant show that they were not endorsed either by the payee or by Smith. On their return to the plaintiff for vouching without endorsements, the plaintiff would find nothing on them to show who had received or what had become of the proceeds directed by the checks to be paid to defendant.

Applying the general proposition and decisions cited above, we now hold the failure of the bank to notify its depositor regarding the checks involved to be a violation of its duty of care under the circumstances involved.

This holding does not foreclose the issue of Bank's liability however. The general principle set out above has an equally dignified corollary, which if applicable, would relieve the bank of the consequences of its unreasonable policy. This corollary provides that if a drawer cloaks his agent in apparent authority to receive the proceeds of checks made payable to the bank's order, the drawer acts at its own risk. *Bank of Southern Maryland, supra*, 389 A.2d at

393 [citing 5A Michie, *Banks and Banking* § 183 (1973)]. Thus, if Publishers, through Simon, Gerhard or Haberman, manifested to the bank that Young had the power to cash checks such as those involved, the bank could not be held liable for paying the proceeds of the checks to the agent.

■ The bank's forceful arguments notwithstanding, the record contains no evidence that any such apparent authority was manifested by Simon or any other employee of Publishers. Simon was never asked nor did he ever volunteer that Young had such authority. The sole basis of the bank's claims to the contrary seems to have been the joint appearances of Simon and Young at the bank. As the trial court notes, "the mere going into the bank with the company's owners would be insufficient to submit to the jury."

The mere fact that Simon refers to Young as a "trusted employee" is not dispositive of the issue of apparent authority. *See Fidelity & Casualty Co. of New York v. Hellenic Bank & Trust Co.*, 181 Misc. 40, 45 N.Y.S.2d 43 (City Ct. of N.Y.1943). Trust in many cases may lead to authority but the two concepts are not synonymous in the law. The confidence reposed in a trusted employee may naturally be thought of as trust within the confinement of that individual's expressly authorized powers. Obviously, Simon "trusted" Young to deposit checks, cash endorsed small checks, and maintain account balances. This does not imply that Young was ever authorized, either expressly or apparently, to draw checks to the Bank's order and exchange them for cashier checks. The course of dealing between Young and the bank, and the signature card of Publishers on file at the bank, indicate that this is so. We therefore conclude and so hold, that no apparent authority existed to relieve the Bank of its duty to notify Publishers.

## II. THE NEGLIGENCE OF PUBLISHERS.

■ The bank alleges that Publishers' negligence prior to and subsequent to the check transactions bars its recovery. We disagree. Just the opposite, the Bank's negligence estops it from asserting the company's negligence as a defense to liability. This principle finds ample support in *Graham v. Southington Bank & Trust*, 99 Conn. 494, 121 A. 812, 817 (1923), discussing the common law concept of estoppel in these situations, and *Bank of Southern Maryland, supra*, 389 A.2d 396–98, discussing negligence as estoppel under the U.C.C.

*Graham, supra*, 121 A. at 817, bluntly states the status of the common law in this regard,

It is universally held that a bank is not entitled to claim estoppel against a depositor in regard to examination of bank statements, unless the bank was free from negligence in regard to failure to acquire the information, ignorance of which it claims the depositor was equitably bound to dispel....

When a bank through its negligence fails to learn of material facts regarding its depositors' accounts the common law imputes constructive knowledge of such facts to the bank, *Id.*

*Bank of Southern Maryland, supra*, rendered upon indistinguishable facts, states matters just as clearly. "Sections 3–406 and 4–406(2) do not bar ... recovery for two reasons." The opinion proceeds to point out that these sections only apply to the negligence of persons asserting an unauthorized signature or alteration, and then only when the bank makes payment in accordance with reasonable commercial standards or with ordinary care. *Id.* 389 A.2d at 397. Therefore, we hold that "there is no balancing test or rule of contributory negligence. If the bank failed to use ordinary care it always loses, whether the customer was negligent or not." *Bank of Southern Maryland, supra*, 389 A.2d at 397 [citing Whaley, *Negligence and Negotiable Instrument*, 53 N.C.L.Rev. 1, 14 (1974)]. We believe this principle to be in accord with the public policy and common sense given the tremendous trust the public is necessarily forced to repose in bank-

ing institutions and the commensurate financial benefits those same institutions enjoy.

The bank's arguments of laches, improper venue, reversible error in adopting the findings and conclusions of the appellee's judgment, and statute of limitations are unpersuasive and have all either been waived, unsupported in fact or law, or untimely and improperly asserted.

### III. PREJUDGMENT INTEREST.

■ Publishers on cross-appeal contends that since the amounts of the funds diverted were all clearly represented on the negligently exchanged checks, it was entitled to prejudgment interest on each instrument as a matter of right. The trial court's refusal to grant such interest is allegedly an abuse of discretion. We agree and reverse the trial court to the extent its judgment denies Publishers prejudgment interest. Without undue discussion, we refer simply to the various persuasive authorities found in the cross-appellant's brief. *See Von Gohren v. Pacific National Bank of Washington*, 8 Wash.App. 245, 505 P.2d 467 (1973); *National Bank of Georgia v. Refrigerated Transport*, 147 Ga.App. 240, 248 S.E.2d 496 (1978); *Aetna Casualty & Surety Co. v. Hepler State Bank*, 6 Kan. App.2d 543, 630 P.2d 721 (1981).

The judgment of the Jefferson Circuit Court is affirmed on direct appeal and reversed on the cross-appeal.

WILHOIT, J., concurs.

LESTER, J., dissents.

LESTER, Judge, dissenting.

I must commend my colleagues upon their well-written opinion, but I feel constrained to differ with them on two points, namely, the apparent authority of William B. Young and the negligence of Publishers acting through its principal owner and chief executive officer, Frank E. Simon.

The doctrine of apparent authority as set forth in *Restatement (Second) of Agency* § 27 and 49 (1958) as approved in *Union Central Life Ins. Co. v. Glasscock*, 270 Ky. 750, 110 S.W.2d 681, 685 (1937), is nothing new or novel to this jurisdiction for it is discussed in *Hurst Home Ins. Co. v. Ledford*, 207 Ky. 212, 268 S.W. 1090, 1091 (1925), and even earlier cases cited therein. It is unnecessary to set forth the principle for the able counsel involved in this litigation, but I do believe that several of the comments or portions thereof are particularly applicable here. In comment a (analogy to authority) under § 27, Creation of Apparent Authority: General Rule, is noted the following:

> So, too, a person who permits another to do an act in such a way as to establish in a community a reputation for having authority to act, either by directing the agent so to represent, or by directing him to act and doing nothing to prevent the spread of such information by the agent or by others, creates apparent authority with respect to those who learn of the reputation.

while comment d contains:

> d. Third persons who know of agent's employment but not of his authority. The position of those who do not know of the prior conduct or reputation of the agent is to be distinguished from those who know of this but are not familiar with the extent of the powers of the kind of agent he appears to be. As to these the agent has apparent authority. Thus, a manager has apparent authority to do those things which managers in that business at that time and place customarily do, as to persons who know that he is a manager, although they do not know what powers managers in such a business have. In such cases the manifestation is interpreted as meaning that the agent has the powers which such managers have, and those dealing with him are entitled to rely upon this as to the extent of the agent's authority, even though they do not know the powers of such managers. This result is consistent with the interpretation of authority.

Under § 49, we note comment g to the effect:

Where agent acts for his own purposes. As stated in Section 39, an agent is authorized to act only for his principal's benefit. However, the fact that an agent secretly intends to act for a purpose of his own or otherwise to disobey the principal does not prevent the existence of a power to bind the principal to one who relies upon the facts which indicate apparent authority, unless the one dealing with the agent has notice of such intent. *See* § 165.

Treating an agent with apparent authority as one who is a "disclosed agent," I refer to § 165, dealing with an agent acting for an improper purpose and find comment d thereunder to be significant in this appeal. That comment teaches:

> Checks. Where an agent, having authority to draw or to endorse checks in his principal's business, makes or endorses a check payable to himself, one taking such check for a private purpose of the agent is put upon inquiry as to a possible breach of trust by the agent. However, the bank upon which such check is drawn is not, from the fact that a check is drawn payable to the agent's own order, put upon inquiry; nor is a bank which accepts for deposit to the private account of the agent a check endorsed by such agent put upon inquiry either as to the authority of the agent to draw checks for his own purposes or to deposit such checks to his own account, or as to the intent of the agent to misappropriate the funds.

It should be recalled that the U.C.C. (KRS 355.1–101) does not displace the law of principal and agent, KRS 355.1–103, so therefore, the *Restatement (Second) of Agency* §§ 27 and 49 remain applicable in this jurisdiction. With this in mind, not only did Young, as characterized by the majority, in his capacity of

> ... "Chief Clerk", "office manager" and "trusted employee" ...

deposit checks to Publishers' accounts, cash small checks requiring endorsement by him, insuring balances were maintained, but he also appeared at the bank in the company of Simon who freely admitted that the personnel of the Bullitt County Bank had been given the impression that Young was clothed with the authority, whether limited or otherwise, to transact appellee's financial business. Therefore, I would conclude that based on the principles of agency, appellant should prevail.

I now turn to the matter of Publishers' and Simon's negligence. At oral argument, it was represented to this court by appellee that Simon was an astute businessman who paid close attention to the financial affairs of his company. The record belies that concept. Recalling that the management of the company was lodged in Simon, Haberman, and Gerhard who made up the entire board of directors, it is at once perceivable that this was a small closely knit corporate enterprise. These three individuals lodged the conduct of the daily affairs in Young. It was Simon's long-standing custom to presign checks and either one of the other two officers "would co-sign as a matter of routine." In my opinion, this was negligence in and of itself. Be that as it may, it was that habit or conduct that put Young in a position for a period of four years and three months to divert funds from the corporation to himself in varying amounts (up to $6,000) for a total of $184,000.00. That fact coupled with consistent audits by one of the most efficient and reputable accounting firms in the nation leads me to believe that there was significant negligence imputed to Publishers. The majority absolves appellee of any negligence primarily upon inferences to be drawn from several sections of the U.C.C. as corrolated in *Bank of Southern Maryland v. Robertson's Crab House, Inc.*, 39 Md.App. 707, 389 A.2d 388, 24 U.C.C.Rep. 702 (1978), but in that opinion Judge Melvin pointed out that:

> The officers and employees of the Bank of Southern Maryland were aware that Hanson had no authority to sign checks on behalf of Robertson's.

> and

> In the instant case, it is clear that Hanson had no actual or apparent authority

to receive the proceeds of the eleven checks here involved.

Notwithstanding *Fidelity & Casualty Co. of New York v. Hellenic Bank & Trust Co.*, 181 Misc. 40, 45 N.Y.S.2d 43 (City Ct. of N.Y.1943) to the contrary, I would conclude that Young had been given the apparent authority and thus apply the principles embodied in *Cairo Cooperative Exchange v. First National Bank of Cunningham*, 4 Kan.App.2d 458, 608 P.2d 1370 (1980), and reverse the decision of the trial court.

One other point I consider worth of comment. The majority distinguishes authorities cited by the appellant for its parties in that they "all involve altered or improperly signed checks and are therefore inapplicable to the controversy at hand." True enough, there is no alteration of a signature or a forgery in those precise concepts in the case at bar. I would extend KRS 355.4–406 to include such an act as Young committed because this extends beyond the alteration of an instrument for it is an alteration of an account by depletion. The Kentucky Commentary following the statute cited above indicates that the principle of at least subsection (5) might be extended "to other types of claims of customers against banks and defenses to these claims, . . . ."

Without elaborating, I think there is merit in appellant's plea of laches.

The purpose of my comments is to point out, in the event of appeal to our court of last resort, the inconsistencies of the law pertinent hereto and the need for an ultimate solution.

For the foregoing reasons, I respectfully dissent.