Virgil PULLIAM, Appellant,

v.

Ruby PULLIAM, Individually; Ruby Pulliam as Executrix of the Estate of Lillian Pulliam, Deceased; and Lincoln Federal Savings & Loan Association, Appellees.

No. 86–CA–116–MR.

Court of Appeals of Kentucky.

Oct. 23, 1987.

Henry E. Hayden, Hayden & McKown, Hartford, for appellant.

Paul L. Madden, Harold Wayne Newton, Hawesville, John G. Thacker, Owensboro, for appellees.

Before HOWARD, McDONALD and WILHOIT, JJ.

McDONALD, Judge:

This case is a controversy involving the rights of the appellant, Virgil Pulliam, in two certificates of deposit to which he was a joint owner with his cousin, the appellee's decedent, Lillian Pulliam. The certificates, dated October 2, 1980, and March 11, 1981, were in the amounts of $3,000.56 and $13,039.60, respectively. There is no dispute that the certificates were purchased with funds belonging to Lillian. Virgil testified that Lillian purchased the certificates in their joint names and gave him actual possession of the certificates in May, 1981. He kept them in his lock box until after her death in November, 1983.

In February, 1981, Lillian executed two powers of attorney appointing the appellee,

Ruby Pulliam, as her attorney in fact. One was a general power of attorney; the other was to become effective in the event of her disability or incapacity. Acting as Lillian's attorney in fact, Ruby went to the appellee, Lincoln Federal Savings & Loan Association, and on July 6, 1982, executed two forms, one for each certificate of deposit in question, entitled "Affidavit For Lost Evidence of Account" which provided that "the evidence of the said account has been lost or destroyed and after diligent search cannot be located." Although the form was entitled "Affidavit . . ." and provided a space for the member's signature to be notarized, neither form was notarized. Lincoln Federal accepted Ruby's unsworn statement that the certificates were "lost" and admitted making no attempt to contact the joint-owner, Virgil, before reissuing the certificates, at Ruby's request, in Lillian's name alone. Virgil was thereby divested of any interest in the certificates which he possessed with no notice whatsoever from the appellee institution.

After Lillian's death, Virgil, who allegedly had no notice of Ruby's prior transaction, took his certificates to the Savings & Loan to be reissued in his name. The institution issued him two new certificates but within a few days realized they had already issued duplicates to Lillian and, for the first time, notified Virgil that duplicates had been previously issued on the accounts in Lillian's name only. Virgil was informed that a "lock-out" had been placed on the accounts "until evidence of true ownership is provided." Nevertheless, without further notice to Virgil, in January, 1984, the Savings & Loan allowed Ruby, as executrix of Lillian's estate, to redeem the duplicate certificates issued in Lillian's name only after she agreed to indemnify the bank for any loss it might incur.

Virgil instituted this action in the Hancock Circuit Court against Ruby and the Savings & Loan. He claimed that Ruby "intentionally and fraudulently" made statements to the Savings & Loan, causing them to issue new certificates in Lillian's name only. His claim against the bank was for negligence and breach of contract.

The case was tried before a jury in November, 1985. The trial court granted the motion of the Savings & Loan for a directed verdict. The jury, because of the Dead Man's Statute, was unable to hear Virgil's testimony of how he came to possess the certificates. It found in favor of Ruby on the fraud claim.

In his appeal, Virgil contends the trial court erred in allowing Ruby's trial counsel, Paul Madden, to testify on her behalf. Madden represented Ruby individually and in her capacity as executrix of Lillian's estate. Madden had been Lillian's attorney and had drafted the powers of attorney. The purpose for his testimony was to corroborate Ruby's testimony that it was Lillian's desire to change the ownership of the certificates of deposit and not a malevolent plot conceived by Ruby.

Virgil's argument in this regard is twofold. He alleges the attorney was barred from testifying because of the Dead Man's Statute, KRS 421.210, and that Madden was required by the Code of Professional Responsibility to withdraw from the case when he became aware of the necessity for his testimony. *See* Disciplinary Rule 5–101 and 5–102.

That KRS 421.210 is not a bar to such testimony is made clear in the cases of *Cook v. Brown,* Ky., 346 S.W.2d 725 (1961); *Adams v. Flora,* Ky., 445 S.W.2d 420 (1969); and *Duncan v. O'Nan,* Ky., 451 S.W.2d 626 (1970). These cases hold that an attorney may represent a personal representative and also testify in will contest cases concerning decedent's competency, undue influence and matters relating to the attorney's representation of the decedent. As far as the Code of Professional Responsibility is concerned, we believe any violation of the rules could form the basis for invoking a disciplinary process. Such rules, however, do not comprise substantive rules of evidence and are not tools an opposing party may utilize to keep out evidence otherwise competent. Thus, we find no error in the court's ruling that Madden's testimony was admissible. Further, we decline to express an opinion on the propriety of Madden's testifying in his client's be-

half; such, we believe, belongs to another forum.

■ We further find no error in the trial court's directed verdict in favor of Lincoln Federal Savings & Loan Association. Virgil asserts the bank is liable to him under both negligence and contract theories and that it was not entitled to a directed verdict. First he argues that the Savings & Loan was negligent when it failed to inquire of him if he had the certificates of deposit when Ruby appeared in July, 1982, claiming the certificates were lost and requesting that his name be deleted therefrom. Although it would be a better practice to require an affidavit from all owners concerning the alleged loss of a certificate of deposit,[1] we don't believe it has any legal duty to inquire of or inform one joint depositor about the actions taken in regard to the account by another joint owner. KRS 391.330 allows a financial institution to pay "[a]ny multiple-party account ... on request to any one or more of the parties."[2] It also allows the institution to pay all funds without any duty to ascertain the contribution of the individual joint owners to the account. *Id.* These statutes appear to us to relieve a financial institution from meddling in the affairs of joint owners of such accounts.

■ Even if the appellee owed a duty to Virgil to notify him of the actions of Ruby intended to divest him of his interest in the certificates, his damages, if any, are entirely speculative. He contends that if the bank had alerted him to Ruby's machinations he could have talked to Lillian and presumably either changed her mind to remove him as a joint owner or be content with the situation, hearing from Lillian herself that she no longer wanted him to share in these sums. Thus, it is likely that had he acquired knowledge of the changes he would not have effectuated any difference in the ownership of the certificates. There

is no question that any dispute concerning the funds during Lillian's lifetime would have been resolved in her favor. KRS 391.310.

■ Next Virgil claims the bank is liable because it breached its contract with him. He relies on *Mercantile Savings Bank v. Appler*, 151 Md. 571, 135 A. 373 (1926), which imposed liability for breach of contract on the financial institution for allowing one joint depositor to withdraw funds from a savings account without presentation of the passbook. The bank in that case had a rule which required the presentation of the passbook to withdraw funds. This case is not controlling because of our statutes concerning multiple-party accounts and because of the plain language on the signature cards signed by Lillian and Virgil. The signature cards, which constitute the contract between the parties in the instant case, provide in pertinent part as follows:

> [The Savings & Loan is] directed to act pursuant to *any one or more* of the joint tenants' signatures, shown below, *in any manner* in connection with this account and ... to pay, without any liability for such payment, *to any one* or the survivor or survivors *at any time.* [Emphasis added.]

There is nothing in this language, either expressed or implied, that requires or directs the Savings & Loan to pay only upon presentation of the original certificates. Virgil has not presented any other evidence of such a contract. Clearly, as the bank did not agree to pay only upon presentation of the certificates, it did not breach any contract when it allowed Ruby, as Lillian's attorney in fact, to remove him from the account although she did not possess the certificates. *See* Annot., 35 A.L.R.4th, 1094 (1985).

---

1. The bank's own affidavit form in fact states that "all account owners should sign." *See also* KRS 289.311 which contemplates that a savings and loan obtain affidavits from all holders of record of any lost "account book or certificate evidencing his savings account...." In this case, Lincoln failed to get any affidavits; however, even had Ruby's statement been notarized, the bank would have been liable to Virgil on the original certificates had his name not been removed from the account prior to Lillian's death.

2. A "multiple-party account" includes a joint account. *See* KRS 391.300.

We are sympathetic to Virgil's sense of betrayal in this situation. However, we do not believe the appellee institution breached any duties to him or any contract; nor do those portions of the Uniform Commercial Code cited by Virgil, KRS 355.4–103 and KRS 355.4–402, place any higher standard of care on the bank than that required under common law rules of negligence. The bank obviously had a duty to "exercise good faith and use ordinary care" in the handling of these certificates of deposit. *Bullitt County Bank v. Publishers Printing*, Ky.App., 684 S.W.2d 289, 291 (1984). There being no evidence that the bank breached this standard, we do not believe the bank liable to him for his loss of ownership interest in the certificates of deposit.

The judgment of the Hancock Circuit Court is affirmed.

All concur.