THE CHARITON PLOW COMPANY, PLAINTIFF IN ERROR, v. J. H. DAVIDSON, DEFENDANT IN ERROR.

1. **Action between Payee and alleged Maker of Note.** In an action between the payee and the alleged maker of a negotiable promissory note for the contents of such note, no question of endorsement before maturity, or for value, or of ther receipt of such note by the plaintiff in the ordinary course of business, without notice of defenses or infirmities, can possibly arise.

2. **Evidence.** A deposition offered in a case which is wholly irrelevant to the matter in issue between the parties should be ruled out on objection.

ERROR to the district court for Otoe county. Tried below before POUND, J.

*C. W. Seymour,* for plaintiff in error.

*Watson & Wodehouse,* for defendant in error.

COBB, CH. J.

The main question involved in this case arises upon the refusal of the trial court to instruct the jury as prayed by the plaintiff, as follows:

"6. The jury are further instructed that when a person sets up fraud to defeat a recovery on a note, and supports such defense by his own testimony alone, and the other party to the transaction by his testimony denies the statements of the defendant in respect to such fraud, and both parties are equally credible, have equal opportunities for knowing, and testify with equal fairness, candor, and truthfulness, and neither is corroborated by other evidence, or by other facts or circumstances shown on the trial, then the defense of fraud is not proven.

"7. The court instructs the jury that if they believe from the evidence that the defendant signed his name to the note introduced in evidence, then the note will entitle the plaintiff to recover, unless the defendant has established, by a preponderance of evidence, that the signature to the note was obtained by fraud, and that the plaintiff had notice of the same.

"8. The court instructs the jury that if the note sued on in this case was transferred to the plaintiff in this case, before maturity, for value and without notice of any fraud in relation thereto, the plaintiff will be protected against any defense by the defendant.

"9. The court instructs the jury as a matter of law that the consideration of a negotiable note cannot be impeached in the hands of an innocent purchaser for value who has received it in good faith before it came due without any notice of such defense.

"10. The jury are instructed that when a person executes a note he must be diligent, and use all reasonable means to prevent a fraud being practiced on him, and if he does not do so he will be liable to an innocent purchaser of the note before maturity.

"11. If the jury believe from the evidence that the defendant signed the note in question in this case, knowing that it was a note, and they also believe from the evidence that the note was made to the plaintiff for a valuable con-

sideration before the maturity of the note in the regular course of business, and the plaintiff at the time of the transfer had no notice that the note was not properly put in circulation, then the plaintiff will have the right to recover even though the jury may further believe that the note was obtained from the maker by fraud, or otherwise wrongfully put in circulation.

"12. That although the jury may believe from the evidence that the note in question was obtained by fraud, still, if the jury believe from the evidence that the plaintiff took the same in the regular course of business in good faith, for a valuable consideration, and before maturity, and without any knowledge of the manner in which it was obtained, then the plaintiff is entitled to recover on the same.

"13. If the jury believe from the evidence that the defendant signed the note sued on, and that the Chariton Plow Company bought the note before due, in good faith, and without any notice of any defense existing to said note, for a valuable consideration, in the usual course of business, then you will find for the plaintiff for the amount now due on said note according to its terms."

The note sued on was copied in the petition as follows:

"No. 173.          HENDRICKS TP., April 8, 1880.

"On or before the first day of Oct., 1880, I promise to pay to the Chariton Plow Company, or bearer, one hundred and fifty dollars at Otoe Co. Bank of Neb. City, with ten per cent interest from date; interest if not paid to draw 10 per cent. We agree to pay all costs of collection, attorney's fee, etc. If collected by a suit a justice of the peace may have jurisdiction of this note.

(Signed),     "J. H. DAVIDSON."

Upon an examination of said copy in connection with the above prayers of the plaintiff it will be readily seen that no question of endorsement before maturity, or for

value, or the receipt of such note by the plaintiff in the ordinary course of business and without notice of defenses, can possibly arise in the case. The plaintiff is a party to the note, the payee, and as such is charged with a knowledge of the facts of its execution and delivery, including the consideration, or at least with such notice of them as would put a man of ordinary prudence upon such inquiry as would have led to such knowledge. According to the defendant's theory of the case, the parties actually taking the said note were the agents of the plaintiff, and whether they were really so at the time of the transaction or not, I think that its claiming property in and suing on the note estops it to deny such agency. See *Vorce v. Rosenbery*, 12 Neb., 448. So that there was no error on the part of the court in refusing to give any of the above instructions, all of them being drawn upon the theory of the plaintiff's holding the note as an endorsee before maturity, except the 6th, which was rightly refused, because to have given it would have been to unwarrantably interfere with the right of the jury to judge of the weight of evidence.

The defendant was sworn and examined as a witness in his own behalf, and testified as follows :

1. Mr. Davidson, are you the defendant in this case?

A. Yes.

2. State if you remember when you first met Ferrin and Williams, and where?

A. They came to my house on the morning of the 8th of April, 1880.

3. Where is your house?

A. In Hendricks precinct, this county.

4. State what was said there by them, or what was done in reference to this matter in this suit?    *    *    *
State what occurred there and what was done by Ferrin and Williams at the time you mentioned.

A. They came there on the morning of the 8th of April, as I have stated, with a spring wagon with one of

these attachments loaded on the wagon. They said that they had received a recommendation from my neighbor, Wm. Perrill, that I was a man who would make a good agent, and requested me to become local agent for this attachment. I was just taking my team out of the stable to go into the field to plow. They appeared to be in a hurry; did not want to consume much time; told me how they wished to sell them, and drew up a contract for me to fill out. They filled out two contracts and I signed them.

Q. Who did they say they were acting as agents for? State that conversation.

A. They were general agents for the state of Nebraska.   *   *   *

5. State who they said they were acting for?

A. They were general agents in the state of Nebraska for the Chariton Plow Company.

6. Of what place?

A. Chariton Plow Company, Iowa.

7. What town?

A. Chariton.

8. Now is that the contract?

A. That is the identical contract.

[Copy of Contract.]

"Ferrin & Williams, state agents for the light draft sulky and attachments, hereby agree to pay in cash for each approved order furnished them by J. H. Davidson the commission set opposite the retail price below:

"Retail price of sulky five.......................$36 00, commission $ 6 00
    "    "    corn plow attachment........ 14 00,    "         2 00
    "    "    field cultivator attachment.  9 00,    "         1 00
    "    "    stalk cutter attachment...... 20 00,    "         3 00
    "    "    rolling coulter.................. 5 00,    "          50
    "    "    3 horse evener.................. 4 00,    "          50
    "    "    complete machines............ 88 00,    "        15 00

" And I, J. H. Davidson, hereby agree to use my influence and best efforts to introduce and sell said machines,

and to make full and prompt payment of all moneys and notes received by me for all machines sold.

"FERRIN & WILLIAMS.

"Address all correspondence to Ferrin & Williams, General Agents, Omaha, Nebraska.

"Ferrin & Williams, Agents.

"J. H. Davidson, Local Agent.

"Hendricks Post Office.

"Dated April 8, 1880."

9. Who executed it?

A. One of these men.

10. Could not say which one?

A. No.

11. Both there at the time?

A. Yes, sir, one of them got out of the buggy and filled this out just by the manure pile.

12. At your stable?

A. Yes.

13. What else did they deliver you there? What others papers?

A. No papers.

14. Did they give any of these? (Referring to number of blank notes with the name of plaintiff printed in as payee.)

A. They gave me those papers.

15. All of these of the same kind as that?

A. Same kind exactly. I have some more at home.

16. What were you to do with those papers?

A. When I sold the plows, I was to take these and a written note as parties bought them.

By the court. Did you sign this contract?

A. Yes, sir.

17. Did they have ink with them?

A. Yes, sir, we had ink and pen.

18. What else was signed there? Do you remember anything else?

A.   Nothing I remember of.

By the court.   Did you see them sign it?

A.   Yes, sir, one of them signed it for both.

19.   You were to act as their agent. as representing them?

A.   Yes, sir.

20.   At that time did you make or execute any promissory note of any kind?

A.   No, they did not ask me for anything of the kind.

21.   State whether or not you authorized any one to write a note for you?

A.   No.

22.   I will now hand you the note (Ex. B), and ask you what you know about that note, and when you first saw that note before?

A.   The first I saw of it it was forwarded to the First National Bank here in the city for collection.   I don't know the exact date, at the time Mr. Woolsey was in the bank.

23.   Did you authorize them to fill up any blank or note for you?

A.   No.

24.   Was there any note spoken of?

A.   No.

25.   Anything of the kind said?

A.   No.

26.   Did you buy anything of them, or get any consideration?     *     *     *     (Not answered.)

27.   State whether or not there was any consideration given for that note?

A.   No consideration whatever.

28.   Did you buy anything?

A.   No, I took the plows on commission.

29.   How many plows did they leave?

A.   One, and they agreed to forward four more from Nebraska City, which came on in due time.   I kept them

for a time, and then told them that I could not sell them at the price they wanted. I addressed them a letter to Omaha, and a letter came from David City, stating that they would come down and make a reduction in price; but they never did.

30. How many sulky plows?

A. Five.

31. Where are they now?

A. In my granary.

32. How long have you been a farmer?

A. All my life.

33. How old are you?

A. Forty-five.

34. * * * * * * * *

35. Do you know the value and character of farming implements?

A. Yes, I have dealt with other firms for five or six years.

36. In farming implements?

A. Yes.

37. Are you able to tell by examination and trial the general value of farming implements?

A. Yes.

38. * * * * * * * *

39. Where are those attachments now?

A. In my granary at home.

40. All of them?

A. All but one.

41. Why do you keep them there? * * * *

42. I will ask you whether or not you were to pay any consideration for the agency?

A. No sir, none at all.

43. How many of these were made out?

A. Two.

44. What became of the other one?

A. They kept it.

45. Can you state to the jury whether or not there were any other papers signed? Was there anything said about a receipt?.

A. They did not ask me to sign any other paper than those. If they got my signature to that they did it them-selves.

46. What was there about signing receipt for plows?

A. I said I might sign for those that were to be shipped from Nebraska City to Palmyra.

47. What further was said about this receipt, and whether they claimed you were signing a receipt cr not,. and how many instruments you remember of signing that. day? * * * No answer.

48. At the time the other four were to come, state what was done then?

A. They presented a paper to me to sign. I thought it was a receipt.

49. And did they represent that it was a receipt? What was said and done?

A. They said I might receipt for those five, and then, any other orders that I might get receipt for them also.

Q. By the court. What did you do then?

A. I signed the paper purporting to be a receipt.

Q. By the court. Where?

A. Right there on the manure pile.

50. Right where you signed the other papers?

A. Yes, sir, the whole transaction was done up in the course of half an hour.

51. Were there any other papers executed at any other place than where you have mentioned or at any other time?

A. No, sir.

52. Did you read what they claimed to be a receipt over?

A. I did not read it over. I did not suppose that it was necessary. I just signed it and let them go.

53. Did you ever see them after that.

A.   No, sir.

The above testimony is not contradicted, nor is there any evidence in the case in conflict with it, except the deposition of Farrin and Williams, which is not very satisfactory. But if there were, the jury having found a verdict for the defendant, the facts stated in his evidence must be taken as true by this court, for the purpose of this opinion.   And these facts are conclusive upon all original parties to the note, and the name of the plaintiff in the body of the note when presented to it by the alleged agents was a circumstance sufficiently out of the usual course of business, if they, Ferrin and Williams, were not the agents of the plaintiff, to have put it upon inquiry which must have led to a knowledge of the facts as testified to by the defendant, and upon such facts no recovery could be had on the note.

The point is also made by the plaintiff in error that the court erred in ruling out the deposition of Wesley Watton.   This deposition when offered was objected to as immaterial, and the objection sustained.   I have carefully read it and do not see how the court could have ruled otherwise.   The deposition is confined to the opinion of the witness as to the merits of a certain plow manufactured by the plaintiff, with a stalk cutter attachment, and used by witness on his farm in Iowa.   There is not even a suggestion that said plow is like the ones left with the defendant.   I cannot see what benefit the deposition could possibly have been to the plaintiff had it been admitted.

The judgment of the district court is affirmed.

JUDGMENT AFFIRMED.

THE other judges concur.