## FIRST NATIONAL BANK IN BROWNWOOD v. FIRST NAT. BANK OF COLEMAN et al. (No. 6575.)

(Court of Civil Appeals of Texas. Austin. May 21, 1924. Rehearing Denied Oct. 8, 1924.)

**1. Banks and banking ⬄162—Whether payee acquired draft as purchaser or whether it was agreed that drawer should not draw against credit given on account of such draft held immaterial.**

Whether payee bank acquired draft as purchaser at time of delivery, or whether it was agreed between drawer and payee that drawer should not draw against credit given him on account of draft until draft was paid, was immaterial, where drawer did draw against credit he had received, and, as between drawer and payee, payee was either equitable owner or had an equitable lien upon draft in its favor, and note of drawer and wife, payable to drawee, which was attached to draft, and payee's correspondent bank had no alternative but to follow instructions and remit proceeds if and when collected to payee bank.

**2. Banks and banking ⬿102—Instructions given by payee to maker of note and draft on redelivery held immaterial.**

It was immaterial what particular instruction payee of a draft may have given to drawer when draft and note were redelivered by payee to him, or what, if any, conditions were attached to such delivery, where drawer was maker of note and draft, and, when payee redelivered them, it made drawer its agent, with apparent authority to bind it and its interest in such note and draft in dealing with third parties.

**3. Banks and banking ⬿171(2)—Correspondent bank liable for negligence and violation of instructions.**

Correspondent bank, which, in violation of instructions of payee bank or through negligence, permitted note attached to draft to come into hands of third person, was liable to owner of note for proceeds.

**4. Banks and banking ⬿102—Correspondent bank, following instructions of drawer having apparent authority to represent payee, not liable for misdelivery of securities.**

Where payee bank intrusted to drawer possession of draft with note attached for purpose of adjustment and drawer delivered them to payee's correspondent, with instructions to deliver such of the papers to third person as latter might request, correspondent bank was not liable for proceeds of note delivered to such third person and converted by him; the drawer having apparent authority to bind payee.

**5. Bills and notes ⬿338—Payee of negotiable instrument bona fide holder for value, if acquiring it in due course of business before maturity and value at common law.**

At common law, payee of a negotiable instrument was a bona fide holder thereof if he acquired it in due course of business before maturity and for value.

**6. Bills and notes ⬿338—Bank held to have acquired note and draft attached in due course of business.**

Where payee of draft with note attached intrusted same to drawer, and latter authorized bank to deliver note to third party, and bank so delivered it, and third party returned note attached to another draft payable to correspondent bank, then bank acquired draft in its favor and note attached in due course of business for value and without notice of any lack of authority on its part to collect proceeds of draft and note.

**7. Principal and agent ⬿103(3)—Third party, intrusted with note, held to have apparent authority to direct disposition of proceeds.**

Where a note was drawn in favor of a bank and placed by drawer in hands of a third party, without instructions to payee regarding disposition of proceeds, party intrusted with instrument had apparent authority to direct disposition of proceeds, and bank was entitled to protection.

**8. Bills and notes ⬿65—If maker authorized bank to deliver note to third party, bank was entitled to protection.**

Where drawer placed his draft in hands of a third party, and to which it was necessary to attach his note, in order to give draft validity, if he authorized payee bank to deliver note to third party, it was incumbent upon him to take up draft, or to instruct payee bank not to pay it, and for failure to do so he was liable and not the bank.

**9. Bills and notes ⬿537(2)—Principal and agent ⬿124(1)—Whether maker authorized bank to deliver note and whether note delivered held for jury.**

In action on a note, whether maker authorized bank to deliver note to third party, and whether bank so delivered it, *held* for jury.

**10. Banks and banking ⬿162—Bank in handling of draft and note held a bailee for hire.**

That no charge was made or contemplated for services rendered by bank, in connection with a draft and note left with it by maker, did not constitute such bank a gratuitous bailee and liable only for gross negligence, where it handled draft and note by arrangement with another bank, who performed similar services without charge, since effect of such arrangement was to offset services of one bank against the other and to constitute bank a bailee for hire and liable as such.

**11. Trial ⬿350(3)—Special issue as to failure to sooner call correspondent bank's attention to draft held properly refused, where evidence showed not detrimental.**

In action by bank against its correspondent bank for latter's fault in permitting third person to convert proceeds of draft, submission of special issues as to whether, if plaintiffs had mentioned draft in its reconciliation statements, the defendant would have earlier discovered conversion and saved itself from loss was not error, where, at time reconciliation statements were exchanged, such third person had checked out all his funds, and there was no evidence that defendant had other means of recouping loss.

Appeal from District Court, Brown County; J. O. Woodward, Judge.

Action by the First National Bank of Coleman against the First National Bank in Brownwood and J. W. Gates, in which both defendants filed cross-actions against each other. Judgment for plaintiff, and judgment for second defendant against first defendant, and first defendant appeals. Affirmed in part, and reversed in part and remanded.

Harrison & Cavin, G. N. Harrison, and E. H. Cavin, all of Brownwood, and Critz & Woodward, of Coleman, for appellant.

Snodgrass & Dibrell, of Coleman, and Wilkinson & McGaugh, of Brownwood, for appellees.

McCLENDON, C. J. This suit was brought by the First National Bank of Coleman against First National Bank in Brownwood

and J. W. Gates, to recover $3,500, the proceeds of a note executed by Gates and wife in favor of Bankers' Loan & Securities Company of Fort Worth, Tex., secured by lien upon real estate owned by Gates in Coleman county. For convenience, the respective banks will be referred to as the Coleman bank and the Brownwood bank.

The Brownwood bank, in addition to defensive pleadings, asked for judgment over against Gates in case judgment was rendered against it. Gates, who had assigned to the Coleman bank his rights in connection with the transaction, set up no defense to the Coleman bank's suit, but asked for judgment over against the Brownwood bank. The case was tried to a jury upon special issues and upon the jury's answers judgment was rendered for the amount of the note and interest, in favor of the Coleman bank against the Brownwood bank and Gates, and judgment over in favor of Gates against the Brownwood bank. From this judgment the Brownwood bank has appealed.

The facts from which the controversy in the case arose, which, except where noted, are without material conflict in the evidence, are substantially the following:

Gates who was the owner of a large amount of real property in Coleman county, had arranged for certain loans, secured by liens upon his real estate, with the Bankers' Loan & Securities Company of Fort Worth, Tex., which company will be referred to as the loan company. The latter was represented, as its agent, to pass upon titles in connection with such loans, by B. E. Hurlbut, who resided at Brownwood, and who also represented others in like capacity. The usual course of business in closing the loans between Gates and the loan company was as follows: Gates and wife would draw a draft in favor of the Coleman Bank, upon the loan company at Fort Worth, for the amount of the loan, to which draft would be attached the note of Gates and wife, in favor of the loan company, and such documents as were necessary to show title in Gates and wife to the security attaching to the note. This draft with the note and other papers attached would be delivered to the Coleman bank to be forwarded to its correspondent bank at Brownwood, where Hurlbut would be permitted to inspect the papers, and, upon his approval, the draft, note, and other papers would then be forwarded to some bank in Fort Worth for collection. On April 7, 1917, the Coleman bank sent to the Brownwood bank three of such drafts with notes and title papers attached, included among which was a draft for $3,500, attached to which was a note for a like amount and certain releases. The letter of transmittal contained the following paragraph:

"Please allow Mr. Hurlbut to inspect these papers before forwarding to Fort Worth. Credit. No protest."

To each draft was attached the typewritten statement:

"Collecting bank wire First National Bank of Coleman when paid."

These drafts were received by the Brownwood bank in due course, and were placed in the hands of one Ray, who had charge of local collections for the bank. Hurlbut called at the bank and inquired for papers from Coleman, and Robertson, the teller, went to Ray's cage and, finding a bundle of papers from Coleman, handed them to Hurlbut, and permitted their inspection in his presence. Hurlbut asked to withdraw the papers from the bank, but this was declined by Robertson, on the ground that it was unauthorized. Robertson, according to his testimony, made no examination of the papers. Later Ray notified Hurlbut that the papers had arrived, and permitted him to examine them in his presence, but declined to allow them to be removed from the bank; and at Hurlbut's request the papers were returned to the Coleman bank. Hurlbut wrote a letter to Gates, informing him that the loans could not be handled under the drafts as drawn, and requested Gates to send drafts to him, drawn in favor of the Brownwood bank. On April 9th, Gates wrote Hurlbut a letter, stating:

"You will find my notes you referred to and release in the Brownwood National Bank, and also draft. However, I inclose the draft you sent me and you can destroy one or the other."

Inclosed in this letter was a $3,500 draft, signed by Gates and wife, and made payable to the Brownwood bank. Upon the return of the drafts, notes, and other papers to the Coleman bank, the latter redelivered them to Gates, in order that he might, in person, take them to Brownwood and adjust with Hurlbut the matter of closing the loans; and on April 10th Gates went to Brownwood, conferred with Hurlbut, and in Hurlbut's presence delivered the papers to Ray. Whether the original $3,500 draft, payable to the Coleman bank, was among these papers, was a disputed issue, which the jury decided in favor of the Coleman bank and Gates. There was also a conflict in the testimony regarding the instructions which Gates gave to Ray concerning the papers. The testimony of Gates was that he advised Ray that he was redelivering the papers on behalf of the Coleman bank, and that the $3,500 draft was ready to be forwarded for collection, and that he gave no authority to Ray to deliver any of the papers to Hurlbut. Ray and John E. Yantis, the vice president of the bank, testified, on the other hand, that the loans were still to be approved by Hurlbut before being sent for collection; that Ray should deliver to Hurlbut such of the papers as he might wish to withdraw from the bank, but taking his receipt for

papers so withdrawn, and that when the loans were completed and the drafts collected the proceeds should be remitted to the Coleman bank for the account of Gates. The $3,500 draft drawn by Gates and wife in favor of the Brownwood bank was not taken up by Gates, but left in Hurlbut's possession; but neither Ray nor any other official of the bank was notified by Gates or otherwise that such draft had been executed or placed in Hurlbut's hands. Later in the day of April 10th, Hurlbut obtained from Ray certain releases originally attached to the $3,500 draft, and gave Ray his receipt therefor; and a short time after this he appeared at the teller's window of the Brownwood bank and presented to Robertson the $3,500 draft of Gates and wife, in favor of the Brownwood bank, attached to which was the $3,500 note and the releases, and at the same time presented a deposit slip for deposit to his individual credit in the sum of $3,500. According to Robertson's testimony, there were several customers at the window at the time, and he asked no questions of Hurlbut, and made no examination of the papers attached to the draft, further than to check the amounts. He gave Hurlbut credit for $3,500, and turned the papers over to Cross, who attended to the matter of foreign collections. The books of the Brownwood bank show that Hurlbut had from time to time drawn checks against this account, and by May 3d had a balance of $3.47 to his credit. The $3,500 draft in favor of the Brownwood bank, together with the note and other papers attached to it, were promptly forwarded to Fort Worth, and were taken up by the loan company. Hurbut committed suicide on May 17th. His estate was insolvent. His balance at the Brownwood bank at that time was $7.39. The $3,500 draft, together with the original letter of instruction from the Coleman bank and Hurlbut's receipt for the release, were found in Ray's cage after Hurlbut's death. There were no communications whatever between Gates or the Coleman bank and the Brownwood bank after Gates left the papers with Ray on April 10th, until after Hurlbut's death, in regard to this transaction. Reconciliation statements which passed between the two banks on April 1st did not include any reference to the $3,500 draft. At the time Gates originally delivered the several drafts to the Coleman bank, he was given credit upon his general account for the full amount of such drafts, and shortly afterwards drew out the amount of such credit. Other pertinent portions of the testimony will be stated later in disposing of the several questions considered.

The findings of the jury, in answer to the several special issues submitted to them, follow:

(1) That the Coleman bank received the draft payable to it as purchaser. (2) That drafts and papers redelivered to Gates by Coleman bank were not so redelivered as his property. (3) That Robertson, at the time he accepted from Hurlbut the $3,500 draft payable to Brownwood bank's order, believed that Hurlbut was authorized by drawers of the draft to direct disposition of its proceeds. (4) That Gates, when he delivered to Hurlbut the $3,500 draft, payable to Brownwood bank, knew that if Hurlbut got possession of the $3,500 note and attached it to said draft he could, by presenting the draft and note to the Brownwood bank, obtain the money thereon. (5) That the Brownwood bank, in accepting from Hurlbut the draft payable to its order and crediting Hurlbut's account with its amount, acted in accordance with the general custom and usage of banks and bankers in handling such transactions. (6) That Robertson, when he accepted the $3,500 draft from Hurlbut, in good faith believed Hurlbut was its owner. (7) That it was not agreed between Coleman bank and Gates when the latter was given credit for the three drafts that Gates should not check against the deposit until the drafts were paid.

"(8) Q. Did the Brownwood National Bank, through any of its officers, have knowledge when it gave credit for same to B. E. Hurlbut that the draft drawn in favor of the Brownwood National Bank for $3,500 was drawn to get money belonging to J. W. Gates from Bankers' Loan & Securities Company, due by said company on a note payable to said Bankers' Loan & Securities Company executed by J. W. Gates and wife?" Answer: "Yes."

"(9) Q. Could the Brownwood National Bank, by the use of reasonable diligence, at the time it gave Hurlbut credit for the draft, have ascertained that the draft was drawn on the Bankers' Loan & Securities Company to get money belonging to J. W. Gates from the Bankers' Loan & Securities Company on a note payable to said Bankers' Loan & Securities Company executed by said J. W. Gates and wife?" Answer: "Yes."

(10) That the $3,500 note was delivered by Gates to Brownwood bank at the time he delivered to the latter the $3,500 draft payable to the Coleman bank. (11) That at the time of the transaction in suit Gates knew of the custom mentioned in question No. 5.

The following special issues were requested by the Brownwood bank, but refused by the trial court:

"(1) Did Vaughn Ray and Jno. T. Yantis, at the time J. W. Gates delivered to said Vaughn Ray in the Brownwood National Bank the drafts drawn by J. W. Gates and wife, payable to the First National Bank of Coleman, and papers accompanying same, believe that said Gates was the owner of said drafts and papers?"

"(2) Did Vaughn Ray deliver to B. E. Hurlbut the $3,500 note mentioned in the testimony of this case?"

"If you should answer the preceding question

'No,' then you need not answer either of the two questions next following:

"(3) Did J. W. Gates authorize the Brownwood National Bank or Vaughn Ray to deliver to B. E. Hurlbut possession of such of the papers delivered by Gates to said Vaughn Ray in said bank as he, the said Hurlbut might wish to have in consummating the loans the Bankers' Loan & Trust Company of Fort Worth, was making said Gates and wife?"

"(4) Did Vaughn Ray deliver said $3,500 note to B. E. Hurlbut because of such authorization by the defendant J. W. Gates?"

"(5) Did defendant J. W. Gates, authorize B. E. Hurlbut to dispose of the proceeds of the $3,500 draft drawn by himself and wife to the order of the Brownwood National Bank?"

Special issues (6) and (7) called for a finding whether, if the Coleman bank had included the draft in its favor in the reconciliation statement, the Brownwood bank would have discovered Hurlbut's fraud and saved itself from loss.

Fifty-eight assignments of error are copied in appellant's brief, which are followed by forty-four "points and propositions." The latter raise, in every conceivable form, a variety of questions of law based upon the several rulings of the trial court. We have reached the conclusion, however, that there are only a few controlling questions in the case, and without attempting to analyze the "points and propositions" put forward by appellant, we will state our views of the rules of law which control a proper disposition of the appeal.

[1] We think it is immaterial whether the Coleman bank acquired, as purchaser the $3,500 draft at the time of its original delivery to it, or whether it was agreed between Gates and the Coleman bank that the former should not draw against the credit given him on account of the draft until the draft was paid. The undisputed evidence shows that, regardless of any agreement between Gates and the Coleman bank, Gates did in fact draw against the credit he had thus received, and unquestionably as between Gates and the bank the latter was, either the equitable owner of, or had an equitable lien upon, the draft in its favor and the note of Gates and wife, payable to the loan company, which was attached to the draft. When the draft with note attached was forwarded by the Coleman bank to the Brownwood bank, the latter had no alternative but to follow instructions and remit the proceeds of the draft, if and when collected, to the Coleman bank.

[2] We think it is also immaterial what particular instructions the Coleman bank may have given to Gates when the draft and note were redelivered by the Coleman bank to him, or what, if any, conditions were attached to said redelivery. Gates was the maker of the note and drawer of the draft, and when the Coleman bank redelivered the note and draft to Gates it made Gates its agent, with apparent authority to bind it and its interest in the note and draft in dealing with third parties, including the Brownwood bank.

It is admitted by all parties to the appeal that neither of the $3,500 drafts would have been paid by the loan company unless accompanied by the $3,500 note, and that there would have been no use made by Hurlbut of the draft in favor of the Brownwood bank, unless he acquired possession of the note so that he could attach it to the draft. In other words, it is conceded by all the parties that neither of the drafts had any practical value without the note.

[3, 4] If, therefore, Ray had no authority to deliver the note to Hurlbut, and if, in violation of such instructions, he did so deliver it, or if Hurlbut otherwise acquired possession of the note from the Brownwood bank and in such manner as to charge the bank with negligence, then we think it follows that the Brownwood bank would be liable to the owner of the note, whether Gates or the Coleman bank, for its proceeds. If, on the other hand, Gates authorized Ray to deliver such of the papers to Hurlbut as Hurlbut might ask for, and in accordance with this authority Ray did deliver the note to Hurlbut, then we think there would be no liability on the part of the Brownwood bank either to the Coleman bank or to Gates, if as a matter of law the possession by Hurlbut of the note and the draft in favor of the Brownwood bank amounted to authority in Hurlbut to direct the payment of the proceeds of the draft and note; or if Gates, when he authorized Ray to deliver the note to Hurlbut, knew or was charged with knowledge of the fact that Hurlbut, by presenting the draft and note to the Brownwood bank, could obtain the money thereon.

[5] At common law the payee of a negotiable instrument may be a bona fide holder thereof, if he acquire it in due course of business, before maturity, and for value. Under the Uniform Negotiable Instruments Act the authorities differ upon the question as to the application of this rule. See extended note and digest of decisions in 15 A. L. R. 437, et seq. The present case arose before the adoption in Texas of the Uniform Negotiable Instruments Act, and is therefore governed by the principles of the common law.

[6] Assuming that Gates authorized Ray to deliver the note to Hurlbut, and that Ray, in pursuance of that authority, so delivered it, then we think clearly the Brownwood bank acquired the draft in its favor and the note attached to it in due course of business, for value, and without notice of any lack of authority on its part to collect the proceeds of the draft and note. But this holding is not decisive of the case. It does not necessarily follow from the right to acquire the note and draft that the proceeds thereof,

when collected, were held by the Brownwood bank unconditionally or subject to the order of Hurlbut. And that is the precise question which the case presents.

[7] When a negotiable instrument is drawn or made in favor of a bank, and placed by the drawer or maker in the hands of a third party without instructions to the payee regarding disposition of the proceeds, the question whether the party intrusted with the instrument has apparent or implied authority to direct the disposition of the proceeds is one upon which the courts before whom the question has come for decision are not agreed. The following cases hold in favor of such apparent or implied authority: Watson v. Russell (Eng.) 3 Best. & S. 34; Nelson v. Cowing, 8 Hill (N. Y.); Armstrong v. Bank, 133 U. S. 433, 10 Sup. Ct. 450, 33 L. Ed. 747; Weirick v. Bank, 16 Ohio St. 296; Bank v. Aull, 93 Tenn. 645, 27 S. W. 1014; 42 Am. St. Rep. 934.

The contrary view is held in the following cases: Knife Co. v. Hank, 41 Conn. 431, 19 Am. Rep 517; Sims v. Trust Co., 103 N. Y. 472, 9 N. E. 605; Hathaway v. County of Delaware, 185 N. Y. 369, 78 N. E. 153, 13 L. R. A. (N. S.) 273, 113 Am. St. Rep. 909; Kuder v. Greene, 72 Ark. 504, 82 S. W. 836; Bank v. Clapp, 17 Cal. App. 657, 121 Pac. 298; Bowles v. Clark, 59 Wash. 336, 109 Pac. 812, 31 L. R. A. (N. S.) 613; Camp v. Sturdevant, 16 Neb. 693, 21 N. W. 449; Plow Co. v. Davidson, 16 Neb. 374, 20 N. W. 256. See, also, the note in 31 L. R. A. (N. S.) 613.

A careful reading of these cases will disclose the fact, we think, that in some of them the question was not necessarily in issue, and in some the court was influenced in part, at least, by the peculiar circumstances which the case presented. On the whole, it would probably be correct to conclude that the weight of decision is with the latter group of cases, of which the Connecticut case is probably the leading authority.

The cases which give protection to the payee or drawee of such instrument are rested upon the doctrine of bona fide holder of commercial paper. The leading case upon the subject is Watson v. Russell, above, and we quote from the opinion of two of the judges in the case.

By Crompton, J.:

"If A., by means of a false pretense or a promise or condition which he does not fulfill procures B. to give him a note or cheque or acceptance in favour of C., to whom he pays it, and who received it bona fide for value, B. remains liable on his acceptance. His acceptance imports value and liability prima facie, and he can only relieve himself from his promise to pay C. by showing that C. is not a holder for value, or that he received the instrument with notice or not bona fide. The instrument is one which C. has a right to take, relying on the acceptance or making of the party, and it is no answer to say that there is no consideration

as between him and the acceptor or maker, if the holder took it bona fide for value."

By Cockburn, C. J.:

"I concur in thinking that the plaintiff is not entitled to recover back the amount of his cheque on the ground of its having been transferred to the defendant by the party to whom it was given, in disregard of the terms on which alone the latter was justified in using it.

"I consider the law to be now quite settled that if a person puts his name to a paper, which either is, or by being filled up or indorsed may be converted into, a negotiable security, and allows such paper to get into the hands of another person, who transfers the same to a holder, for consideration and without notice, such party is liable to such bona fide holder, however fraudulent or even felonious, as against him, the transfer of the security may have been.

"And in this respect there can be no difference between a bill of exchange and a cheque, which, substantially, is the same thing as a bill of exchange, although, by the custom of bankers, the preliminary of acceptance is dispensed with.

"It follows, from the rule of law to which I have referred, that a party thus rendered liable by the wrongful transfer of negotiable security to which he has put his name cannot, after the amount has been paid, recover it back in an action for money had and received. To allow such an action to succeed would obviously be to defeat and abrogate the rule in question, which is now too firmly settled to be questioned."

The cases to the contrary hold that the form in which the instrument is drawn carries notice on its face that the maker or drawer is the owner, and no apparent or implied authority to direct disposition of the proceeds can be drawn from the bare fact that the instrument has been intrusted to a third party for delivery to the payee.

We have reached the conclusion that the better reasoning supports the view that the payee, in such circumstances, is entitled to protection. This conclusion seems to us to be a logical deduction from the rule that the payee of a negotiable instrument may be a bona fide holder. In the absence of special circumstances, imparting notice to the contrary, it seems unreasonable to hold that, where such an instrument has been intrusted to a party for delivery to the payee, the latter should be required to communicate with the maker or drawer before acquiring it from the one into whose hands it has been intrusted by the maker. In the Armstrong Case, above, it was held, without qualification, that the instrument, a foreign bill of exchange, so drawn had four parties to it, namely, the drawer, the drawee, the payee, and the remitter, and that the usual course of business was for the drawer to deliver it to the remitter and for the latter to deliver it to the payee.

In such a course of dealing, the court hold the payee is a bona fide holder for

value, and want of consideration is no defense, citing, among other cases, Watson v. Russell, above. We see no reason why this rule should not apply in the case of any negotiable instrument, as was the holding in Watson v. Russell in the case of a check. The maker or drawer has it in his power to inform the payee of his desires and purposes, and, when he does not do so, and places the instrument in the hands of another, he should not be permitted to deny the authority of the remitter to convey to the payee his otherwise unexplained intentions. This, we think, is a proper case for application of the ancient maxim that he who trusts most must suffer most.

Independently of this view, however, we think the Brownwood bank entitled to protection, if the note was delivered to Hurlbut by Ray under authority of Gates.

[8] Gates lived in Coleman county. He was not a depositor or debtor of the Brownwood bank, and, so far as the record shows, had no other dealings with that bank except through the Coleman bank. Hurlbut was a regular depositor of the Brownwood bank, and the findings of the jury, which are amply supported by the evidence, were that the cashier, Robertson, believed that Hurlbut was authorized to direct disposition of the proceeds of the draft; that Gates, when he delivered the draft to Hurlbut, knew that by attaching the note to it he could get the money on it from the Brownwood bank; that the latter, in accepting the draft and crediting Hurlbut's account with it, acted in accordance with the general custom of bankers in handling the transaction; and that Gates knew of such custom. Gates was the agent of the Coleman bank, and the law imputes his knowledge to his principal. With this knowledge, if he authorized Ray to deliver the note to Hurlbut, it was incumbent upon him either to take up the draft in Hurlbut's hands, or instruct the Brownwood bank not to pay it. He did neither. For the consequences of his negligence in this regard he and his principal must suffer, and not the Brownwood bank.

The findings of the jury in answer to the eighth and ninth special issues, quoted above, do not, we think, mitigate against this conclusion. The Brownwood bank had knowledge that the draft in its favor was drawn to get money from the loan company belonging to Gates. This was self-evident from the fact that Gates drew the draft on the loan company, and was maker of the note attached to it. But knowledge of that fact alone was not sufficient to charge the Brownwood bank with notice that Hurlbut was not authorized to direct disposition of the proceeds of the draft when collected, nor to put the Brownwood bank upon inquiry in that matter. It knew, of course, of the existence of the draft in favor of the Coleman bank, but had no knowledge that a draft in like amount was in Hurlbut's hands until the latter presented it with the note attached. The very fact, we think, that the latter draft was left outstanding in Hurlbut's hands carried with it the implication, when it was presented with the note attached, that the matter was to be handled in the ordinary way under the custom of banks, and that the instructions relative to the other draft might be disregarded.

[9] It therefore becomes of vital importance to determine whether Gates authorized Ray to deliver the note to Hurlbut and if so whether Ray so delivered it. The evidence in this regard was conflicting, and submission to the jury of the issues thus presented was properly embodied in appellant's special issues numbered 2, 3, and 4. The refusal of those issues by the trial court was, we think, reversible error.

[10] Appellant contends that, as no charge was made or contemplated for the service rendered by it in connection with the draft and note left with it by Gates, it was a gratuitous bailee and liable only for gross negligence, and that gross negligence was not shown, even if Gates did not authorize delivery of the note to Hurlbut. The evidence showed without contradiction that the Brownwood and Coleman banks were regular correspondents and handled transactions of this character for each other and their customers without making any charge. The effect of this arrangement was to offset the services of one bank against those of the other. We think there can be no question but that under this arrangement each bank, when acting thereunder, was in effect a bailee for hire, and liable as such. A full discussion of this subject is given in Bank v. Ratcliff (Tex. Com. App.) 253 S. W. 253.

[11] In our opinion there was no error in refusing appellant's special issues 6 and 7. At the time the reconciliation statements were exchanged, the Brownwood bank had paid out on checks of Hurlbut all but three or four dollars of his deposit. There was no evidence that appellant had any other means of recouping its loss, which had already accrued. Two weeks later Hurlbut died, leaving an insolvent estate. There was no showing, therefore, that failure of the Coleman bank to mention the draft in connection with the reconciliation statements operated to the detriment of the Brownwood bank.

The conclusions above announced dispose of all issues raised in the appeal.

For the errors indicated, the judgment of the trial court in favor of appellees against appellant is reversed, and the cause remanded to that court for a new trial. The trial court's judgment in favor of Coleman bank against Gates is affirmed. Costs of appeal will be taxed against appellees.

Reversed and remanded in part, and in part affirmed.