## THE BRISTOL KNIFE COMPANY *vs.* THE FIRST NATIONAL BANK OF HARTFORD.

The treasurer of the plaintiffs, a manufacturing corporation, sent by a messenger a check received for goods sold, to a bank in a neighboring city, in which they kept an account, endorsing the check to the order of the cashier of the bank. The treasurer knew at the time that the messenger was untrustworthy. The check was enclosed in a sealed envelope, with a deposit ticket, but the messenger broke open the envelope, and presented the check to the teller of the bank, stating that the plaintiffs wished him to get the amount in currency to pay their hands. The teller after consultation with the cashier, and further enquiry of the messenger, gave him the bills, and he absconded with the money. The plaintiffs had in former cases obtained currency from the bank upon their own checks and once upon a note discounted, but in no instance upon the check of a third person, and the payment in this case was not in the usual course of business. In a suit brought by the plaintiffs against the bank for the amount of the check, it was held that they were entitled to recover. (Two judges dissenting.)

ASSUMPSIT for money had and received; brought to the Superior Court in Hartford County, and tried on the general issue, closed to the court, before *Pardee, J.* The court found the following facts :—

The plaintiffs are a manufacturing corporation located in Bristol in Hartford County, and have been long in the habit of keeping their account in the defendant bank by depositing checks, drafts and notes. They at first endorsed all paper deposited, " Pay to First National Bank or order," but about a year before the date hereafter mentioned, the cashier of the bank requested them to endorse their paper, " Pay to the Cashier of First National Bank or order," which request they had followed.

On the 16th of July, 1872, the plaintiffs received from one of their customers a check, of which the following is a copy :

"New York, July 16, 1872.

"THE SECURITY BANK.

" Pay to the order of Theo. Myers One Thousand and thirty-nine $\frac{77}{100}$ dollars.                J. A. HOPPER."

" $1039 $\frac{77}{100}$.

*Endorsed.* " Pay to order of Bristol Knife Co.   THEO. MYERS."

The treasurer of the company endorsed the check as follows: " Pay to order of Cashier First National Bank.   BRISTOL KNIFE Co., per W. R."

The president and treasurer, William Reynolds, kept a drug store in Bristol, and kept the books of the company in his store, and used it as the office of the company. He had there his older brother as a clerk, and did business under the style of Reynolds Bros.

The brother knew that William Reynolds had this check and intended to send it to the defendants for deposit by mail, and told him that he was going to Hartford and would take it and deposit it for him. William Reynolds thereupon put the check so endorsed in a sealed envelope with a deposit ticket, gave it to his brother, and requested him to deposit the check to the credit of the company, and get the bank

book. The brother came to Hartford, opened the envelope and took out the check, went into the First National Bank, and handed the check to the teller, saying nothing. The teller looked at the check and asked if it was to be deposited, and the brother said, No, that he wanted currency for it, as the company wanted to pay off their hands. The teller called the cashier and showed him the check, and told him what was desired. The cashier asked the brother who he was, and he said he was the brother of William Reynolds, which statement the cashier thought, from his strong personal likeness, was true. The cashier thereupon directed the teller to give the currency to the brother, which he did. The cashier wrote on the back of the check, " Endorsement correct," and had the brother sign it. The cashier then endorsed it, " Pay Central National Bank, N. Y., or order. *C. S. Gillette, Cashier :*" and the bank sent it to New York and received the money on it, but made no entry of the transaction in account with the plaintiffs and claimed it as their own.

The brother went off with the money, and the plaintiffs have never been able to find him, though they have made an effort to do so. William Reynolds knew that his brother was addicted to excessive drinking.

The plaintiffs had at other times obtained currency from the bank by checks, and once from a discount, but never upon any check of a third person like this. This brother had never been employed by the plaintiffs in any business with the bank, or any one else.

To all the plaintiffs' evidence establishing the above facts the defendants excepted as inadmissible in general assumpsit, but the court overruled the exception and admitted the evidence.

The plaintiffs offered several bank officers to show that the payment of a check in the foregoing manner was not in the regular course of business.

To this evidence the defendants objected, on the ground that the opinion of experts was immaterial to the construction of the contract and the rights of bonâ fide purchasers in this form of action, but the court overruled the objection

and admitted the evidence, and thereupon other evidence on the point was offered by the plaintiffs and defendants, and the court found that the presentation of this check and the asking for and reception of that exact amount of currency therefor by the plaintiffs without any entry thereof on the accounts of either of the plaintiffs or defendants, was not according to the ordinary way of using such checks as between banks and persons having deposit accounts with them; the ordinary way being for the banks to receive such checks from and credit them to these persons and for them to obtain the avails by drawing their checks upon the banks.

Upon these facts the court rendered judgment in favor of the plaintiffs for the amount of the check and interest, and the defendants moved for a new trial.

The case was argued before this court at the last term, but the four judges (Judge PARDEE being disqualified and not sitting) were equally divided upon it, and a re-argument was ordered. At the present hearing Judge LOOMIS of the Superior Court was called in to sit in the place of Judge PARDEE.

*Robinson,* in support of the motion, cited Chitty on Bills, 231 ; *Lee* v. *Chillicothe Branch Bank,* 1 Bond, 387 ; *Trimbey* v. *Vignier,* 1 Bing. N. C., 151 ; 1 Parsons on Notes & Bills, 257 ; *Roberts* v. *Hall,* 37 Conn., 212 ; *Young* v. *Grote,* 4 Bing., 253 ; *Tucker* v. *Woolsey,* 64 Barb., 144 ; *Brush* v. *Scribner,* 11 Conn., 392 ; *Hoyt* v. *Seeley,* 18 id., 358 ; *Goodman* v. *Simonds,* 20 How., 343, 366 ; *Murray* v. *Lardner,* 2 Wall., 110, 121 ; *Wilson* v. *Holmes,* 5 Mass., 543 ; *Fisher* v. *Pomfret,* Carthew, 403.

*Perkins,* with whom was *Newell,* contra, cited 1 Parsons on Notes & Bills, 277 ; 2 id., 279 ; Chitty on Bills, 227, 255 ; *Roberts* v. *Tucker,* 16 Adol. & El., N. S., 578 ; *Clark* v. *Whitaker,* 50 N. Hamp., 474 ; *Roberts* v. *Hall,* 37 Conn., 212 ; *Belknap* v. *Bank of N. America,* 100 Mass., 381 ; *Bank of N. America* v. *Bangs,* 106 id., 445 ; *Doubleday* v. *Kress,* 50 N. York, 410.

LOOMIS, J. The principles that control this case are not

Bristol Knife Co. *v.* First National Bank.

to be found in any distinction between special and restrictive indorsements of negotiable paper, nor in any view of the rights of bonâ fide holders or purchasers of such paper.

The record shows that the defendants put no faith in any title which the holder of the check had or assumed to have ; hence their position is not like that of a bonâ fide purchaser of negotiable paper, from a holder clothed with the apparent legal title.

The holder in this case not only made no pretence of title, but openly professed to act only in behalf of the plaintiffs.

The defendants well knew that the check was the property of the plaintiffs, that the transaction was wholly with them, and that they must account to them for the avails. It is found that the defendants have collected the full amount of the check ; but have they ever accounted to the plaintiffs for the same ?

It is conceded that they paid the amount of the check to the messenger who brought it to the bank, and the question is, whether such payment, in legal effect, is a payment to the plaintiffs ?

The whole case resolves itself into a mere question of agency. Had the messenger who delivered the check at the bank authority from the plaintiffs to receive the money thereon ? It is conceded that there was no authority in fact. The only authority of the messenger, in fact, was to deliver to the bank the sealed envelope containing the check and deposit ticket, have the check credited to the plaintiffs, and get the bank book. He was not in any sense a general agent, he had never done any business for the plaintiffs of any kind, and was an entire stranger to the officers of the bank.

He was only a special agent, and that, too, of exceedingly limited authority. And here the familiar and elementary rule of law applies, " that an agent constituted for a particular purpose, and under a limited power, cannot bind his principal if he exceeds that power. Whoever deals with an agent constituted for a special purpose, deals at his peril when the agent passes the precise limits of his power."

We would not, however, adhere so closely to the literal

terms of this rule as to do injustice to innocent third parties, who have acted on the confidence of an apparent authority for which the principal is justly responsible. But in order to bind the principal he must, by his words or acts, have fully authorized the third party to believe that the agent had authority, and in applying this rule to business transactions care must be used to distinguish clearly between the act of the principal and the mere act of the agent. If the agent by his act assumes an appearance of authority which induces a third party to believe he has, in fact, authority, it is not sufficient. It is the principal's own act only that gives to the agent an appearance of authority which becomes binding on him.

If, then, we look at the act of the plaintiffs, without reference to what the messenger wrongfully assumed, we find that all the plaintiffs did was to indorse the check payable to the order of the cashier, and put it, together with a deposit ticket, in a sealed envelope, and hand it to the messenger to carry to the bank and have it credited, and bring home the bank book. These acts of the plaintiffs do not, it seems to us, imply any authority in the messenger to collect the money on the check.

If the sealed envelope, containing the check and deposit ticket, had been presented to the bank in the same shape as delivered to the messenger, it would have been clear that only a deposit was intended.

It may be suggested that the presentation by the messenger of the naked check at the bank ought to be considered as authorized by the principal for the purpose of fixing the liability.

We do not so regard it. Suppose the envelope had inclosed a written request, relative to the matter, intended for presentation to the cashier, and the messenger had broken the seal and destroyed the writing, and had presented the check by itself; would we judge the principal in such case simply by the fact that the special agent was authorized to present the check? If so there would be no safety in employing a messenger to do the simplest errand.

But, if we concede, for the sake of argument, that. the authority given to the messenger was to present the check by itself to the bank, we do not think an authority to receive the money can fairly be implied under the circumstances of this case.

The circumstances here do not enlarge the apparent scope of the agent's authority, but greatly contract it.

The form of indorsement, " Pay to the order of. the cashier," was unnatural, if the plaintiffs intended to have the . bank pay the money to the messenger. The object of this special indorsement was, undoubtedly, to prevent the bank from paying the check to any one except the plaintiffs, and everybody, except the bank itself, would be precluded from collecting it in that form ; and, under such circumstances, we think the presentation of  ·ᴜ check at the bank, by a perfect stranger, who .called for the currency on it, ought to have aroused suspicion.

It would seem impossible, when the currency was called for, to suppress doubts and inquiries, like the following :— Why did not the plaintiffs indorse the check payable to bearer, or to the order of the messenger ? or, why did they not send a check to draw the amount? or why did they not send an accompanying letter of explanation ?

And suppose there had been an indorsement by the plaintiffs, to pay this ·check to the bearer, or to this messenger by name.   In such case, though it would have been legally safe to have paid the money to this messenger, yet, would not common prudence require the officers of the bank to request that some person known to the bank should identify the bearer, who was a perfect stranger to them ?

In this case, though the bank was trusting a stranger at their own peril, yet they required no evidence of his authority, except the possession of the check, and his verbal statement, corroborated in the opinion of, the cashier by some personal and family resemblance which he bore to the treasurer of the plaintiffs.

Again, it is found by the court that the payment of the money on a check indorsed like this was not the ordinary

.way of using such checks, as between banks and persons having deposit accounts with them, but that the regular course was for the banks to credit the checks to the account of the other party, who obtained the avails by drawing their own checks on the bank.

And it is further found that such was the uniform practice and course of dealing between the parties to this suit, prior to the transaction in question.

Under all the circumstances to which we have adverted, it seems clear that the natural presumption arising from the presentation of this check, specially indorsed payable to the order of the cashier, was, that it was intended for a deposit; and so it seemed to strike the mind of the teller at the time, and it was only when the cashier put faith in the mere story and appearance of the messenger 'that this presumption yielded, and the defendants were deceived to their injury; but in so doing they were dealing with a special agent, at their peril, who was no longer pursuing the authority of his principal, either in fact, or as exhibited to the public.

A new trial is not advised.

In this opinion PARK, C. J., and CARPENTER, J., concurred.

PHELPS, J.  I am unable to concur.  The plaintiffs were the primary, if not the sole, cause of the fraud which was committed.  If they had forwarded the check by express, or mail, the appropriate and usual modes of transmitting funds to a depositary, or had delivered it personally, or intrusted it to a sober and honest messenger, as they were bound to have done if they employed any, no one would have been injured. The facts, though stronger, are in principle precisely analogous to those which controlled the judgment in *Young* v. *Grote*, 4 Bingham, 253.

ᶜ The managing agent and proper officer of the plaintiffs indorsed the check in full so as to legally vest the title in the defendants on delivery, and so endorsed, confided it to his brother, who was known by him " to be addicted to excessive drinking," with *verbal* directions to deliver it to the defendants

for a particular purpose, and thus enabled him to appear to the defendants as having a lawful right to deliver it for any legitimate purpose for which the defendants might receive it. The plaintiffs thereby placed him in a position, and put it in his power, to perpetrate a fraud. He was dishonest as well as intemperate, and the defendants in the exercise of reasonable prudence and diligence trusted to his representation respecting the purpose of the delivery of the check and were deceived. "The principles of equity as well as of commercial law require that he who has thus put it in the power of another to defraud should himself sustain the loss, rather than the person who has given credit to those appearances." *Brush* v. *Scribner*, 11 Conn., 392 ; *Hoyt* v. *Seeley*, 18 id., 358 ; Story on Agency, §§ 127, 139. "When one of two innocent persons must suffer, it is more reasonable that he should suffer whose act of employing an unskilful or negligent servant was the cause of the injury, than that the other who had been wholly in the right should be compelled to bear a loss brought upon him through another's want of care in not attending to his own business and in intrusting it to the carelessness of his servant." *Thames Steamboat Co*. v. *Housatonic R. R. Co.*, 24 Conn., 54. It is more reasonable that a party employing an agent should be responsible for his misconduct, than that an innocent party who confided in him should suffer. *Willard* v. *Buckingham*, 36 Conn., 402.

That the defendants acted in good faith is conceded. It is said however that the plaintiffs had never previously received currency from the defendants in this way, and that it was contrary to the common practice of the defendants to pay it out on checks of this description. Undoubtedly this fact imposed on the defendants the exercise of greater diligence and caution than if the fact had been otherwise. But what more than the defendants did could they have been reasonably required to do ? Their diligence was substantially and correctly answered with respect to every thing except the integrity of the plaintiffs' messenger. His representation that he was the brother of William Reynolds, who was the principal manager of the business of the plaintiffs, was true,

his identity was established, and the plaintiffs' indorsement of the check genuine. How were the defendants to discover his dishonest motive in demanding currency for the check and appropriating it to his own use ? They knew nothing of him, his character or habits. It surely cannot be said that reasonable diligence required of them, before paying the check, to write or telegraph to Reynolds the inquiry whether his brother to whom he had intrusted the check was honest and trustworthy, and under the circumstances I think they may have properly considered and treated the messenger as sufficiently accredited by the plaintiffs. Otherwise a serious obstacle to the free use of such paper, and a like unusual and unexpected embarrassment to bankers in the transaction of their business, will be found to exist. I would do nothing to impair in the slightest degree the proper force of the obligation which rests upon them to exercise reasonable care in such and all similar cases, but think the defendants were not wanting in the diligence which the law required. *Goodman v. Simonds*, 20 Howard, 343, 366; *Murray v. Lardner*, 2 Wallace, 110, 121. If the person presenting the check had been a stranger to the plaintiffs, and forged the indorsement, and the defendants had paid the check, they could have interposed no sufficient defence against the plaintiffs' claim ; and so also if he had stolen the check after indorsement and falsely stated the purpose of the delivery. In those cases the plaintiffs would not have employed or been otherwise identified with him as a principal, or have placed him in a position which enabled him to defraud the defendants, and would have been free from such fault as essentially contributed and directly operated to produce the injurious result. But here was no forgery, or theft, but simply a wrongful conversion, or breach of trust, by the plaintiffs' messenger and agent, and connected with it a false and fraudulent statement of the object of the delivery of a check so endorsed as to pass, and vest in the indorsee, the legal title when the delivery should be thereafter made. I think it cannot properly be maintained that the owner of a check may so indorse and give it currency, and place it for delivery in the hands of

Bristol Knife Co. *v.* First National Bank.

such an agent, and make the party who innocently receives and pays it resposible for the fraud and loss. As between the parties, justice is manifestly violated by compelling the defendants to pay it the second time.

The messenger was the special agent of the plaintiffs for the purpose of delivering the check to the defendants as a deposit. But in the absence of any written message to the defendants handed to them in connection with the check and specifying the object of the delivery, the apparent scope of his authority would by necessary implication seem to extend to a verbal statement of the object for which it was to be received by the defendants. How otherwise, aside from the previous course of dealing of the parties, could the defendants have been informed ? In that dealing by the defendants there was nothing in the nature of an estoppel, and the most that can be said is that the defendants were bound to the exercise of greater diligence than if such a course of dealing had not existed. The general principle with regard to the effect upon parties of the ordinary course of business in the use of commercial paper as determining the rights of the holder, has no more than a collateral relation to this question. The pertinent inquiry is, did the defendants, in consideration of the particular act done, and in view of the attending circumstances, exercise reasonable caution and diligence ? Although unusual, it was perfectly legitimate for the defendants to receive the check and pay its value in currency. It was not irregular or unbusinesslike to do it. The defendants knew the plaintiffs were a manufacturing corporation employing workmen and paying them in currency, and had previously supplied the plaintiffs on their own checks for that purpose. The particular mode of performing the act was immaterial, except so far as it tended to characterize, or raise a presumption affecting the propriety of the act itself. No suspicion of bad faith attaches to it, and it was what the defendants might at any time very properly be requested by a customer to do. When the plaintiffs needed currency they might not always have a balance to their credit, and it would be more convenient to forward for its amount in currency

the check of a third party in their possession than to deposit that check and draw against it the plaintiffs' own check. Either mode is equally lawful and proper, and no unfavorable presumption should attach to a party who adopted either in a particular instance contrary to his usual custom.

While the law requires of a party dealing with a special agent to ascertain the extent of his authority, it establishes the scope of the authority given as the criterion of actual authority ; and the acts done pending and in pursuance of the agency and within its apparent scope, and the declarations made by the agent at the time and explanatory of them, are the acts and declarations of the principal. *Tucker* v. *Woolsey*, 64 Barb., 144 ; *Thallhimer* v. *Brinkerhoff*, 4 Wend., 594 ; *S. C.*, 6 Cowen, 99 ; *Hartford Bridge Co.* v. *Granger*, 4 Conn., 147 ; *Norwich & Worcester R. R. Co.* v. *Cahill*, 18 Conn., 485 ; *Willard* v. *Buckingham*, supra.

The declaration of the plaintiffs' agent respecting the use to be made of the check was of that character. It was a verbal act in connection with, and explanatory of, the manual act of delivering the check. It was made *dum fervet opus*, and constituted an essential part of the *res gestae*. It was done by authority derived by implication from the actual authority given and was the legal act of the plaintiffs. 1 Green. Ev. §§ 113, 114 ; *Perkins* v. *Burt*, 2 Root, 30 ; *Smith* v. *Board of Water Commissioners*, 38 Conn., 218.

For the reasons given I think a new trial should be advised.

FOSTER, J., concurred in this opinion.