*265
 
 PONDER, Justice.
 

 In this suit the’ plaintiff seeks to recover from the defendant the sum of $100,000.00, with interest and. costs. The plaintiff’s demand having been rejected in the lower court, it has appealed.
 

 In the afternoon of June 9, 1939, Dr. James Monroe Smith, President of the Louisiana State University and Agricultural and Mechanical College, came to the City National Bank of Baton Rouge, after banking hours, to consummate a loan which the vice-president of the bank had agreed to make to the University. He informed the cashier of the bank of the agreement. The agreement was confirmed by a telephone communication. Smith presented to the cashier what purported to be a resolution of the Board of Supervisors of the University duly certified in the form usually relied upon when previous loans had been made to the University by the bank. A note calling for $100,000.00, payable on demand and bearing 3i/£% interest from date was duly executed in the name of the University by Smith. When the cashier attempted to credit the proceeds of the note as a deposit, Smith informed him that the University had obligations' to meet in New Orleans and wanted the funds made available to it at the Louisiana Savings Bank & Trust Company of that city. He requested the cashier to issue a check covering the entire proceeds of the loan payable to that bank. The cashier, in compliance with Smith’s request, executed and delivered to Smith the bank’s check for $100,000.00 drawn on the Hibernia National Bank in New Orleans and payable to the Louisiana Savings Bank & Trust Company. On the morning of the following day, Saturday the 10th, the check was presented to the Louisiana Savings Bank & Trust Company, hereinafter referred to as the defendant bank, by J. M. Brown. The check was endorsed and collected by the defendant bank, the proceeds were credited to the account of Brown, who immediately issued his check to Fenner & Bean, a brokerage firm, to whose account they were credited. The entire transaction was completed prior to twelve noon that day. The record does not shown how Brown came into possession of the check or any authority on his part to negotiate it. It appears that the assistant cashier of the defendant bank who handled the transaction did not testify in the case and the record does not disclose what transpired between him and Brown at the time of the transaction. There is evidence that the assistant cashier was absent from the estate at the time the case was tried but was available on two occasions after the suit was filed. Irrespective of whose duty it was to secure his testimony by deposition or otherwise, there is no evidence in the record as to what transpired between him and Brown except a bare statement of a bank official to the effect that he would swear that the assistant cashier made inquiry of Brown at the time. This witness stated in his testimony that he did not know precisely what con
 
 *267
 
 versation took place between them because he did not handle the transaction. Brown did not testify in the case and we are not informed of his version of the transaction. It appears that he was going under an assumed name and became involved in questionable transactions. His whereabouts do' not appear to be known. From the testimony produced by the defendant it appears that the officials of the bank had confidence in Brown at the time and that he was a depositor in the bank. However, at the time the transaction was consummated his deposit called for a very small amount. An official of the defendant bank testified that Brown was an independent broker and that the nature of his business was not such that required large deposits because his transactions were usually handled by immediate transfers.
 

 The defendant bank had no instructions from the plaintiff as to the disposition of the proceeds of the check. The University has repudiated the entire transaction on' the ground that the purported resolution of its board was a forgery and that it has not received any part of the proceeds. As the matter stands the plaintiff’s account with the Hibernia Bank has been charged with the amount. The plaintiff is now seeking to recover from the defendant.
 

 The plaintiff contends that the defendant had no authority to pay the proceeds of the check to Brown. It takes the position that it was the duty of the defendant to see that the proceeds were not improperly dispersed and that the funds were illegally paid without any direction from it.
 

 From our review of the jurisprudence of the states, we find that one of the leading cases referred to in many decisions touching the point in controversy is the case of Sims Ex’r, v. United States Trust Company of New York, 103 N.Y. 472, 9 N.E. 605, 606. The doctrine laid down in that case seems to be universally followed. In that case, Dr. Sims drew a check on a bank payable to another bank. He gave the check to a party by the name of Crowell with instructions to deposit it to Sims’ account with the payee bank. Crowell had a certificate of deposit issued to himself as trustee of Sims and shortly thereafter drew the money out and converted it. In disposing of the resultant liability the court had this to say:
 

 “The check, upon its face, imported the ownership of the moneys represented in it by Dr. Sims, and his desire that its custody should be transferred from the People’s Bank to the defendant. This certainly did not warrant the defendant in supposing that Dr. Sims thereby intended to pay $5,000 to Crowell, or place him, for any purpose, in possession of the fund. If he had so intended, the check would have been made payable to Crowell’s order, and there would have been no need of the agency of the defendant in the transaction. The use of the defendant’s name as payee of the check indicated the drawer’s intention to lodge the moneys in its custody, and place
 
 *269
 
 them under its control, and nothing further than this was inferable from the language o-f the check. The check, by its terms, authorized the defendant to withdraw from the People’s Bank a certain sum, for a purpose not disclosed, but fairly inferable from the nature of the defendant’s business.”
 

 “The defendant could have refused to receive the deposit, or act as Dr. Sims’ agent in transferring the funds from one custodian to another,' but, having accepted the office of so doing, it was bound to keep Dr. Sims’ moneys until it received his directions to pay them out.
 
 The language of the check making the funds payable only upon, the order of the defendant imposed upon it the duty of seeing that they zvere not, through its agency, improperly disbursed after it had received them. They coztld not safely pay out su-ch funds except under the direction of their lazvful owner."
 
 (Italics ours.)
 

 It is stated in Vol. 9, Corpus Juris Secundum, page 682,'§ 340 — Verbo, Banks & Banking, as follows: “Checks payable to bank. Where a check is drawn to the order of a bank to which the drawer is not indebted, the bank is authorized to pay the proceeds only to persons specified by the drawer; it takes the risk in treating such a check as payable to bearer and is placed on inquiry as to the authority of the drawer’s agent to receive payment.” Citing Paine v. Sheridan Trust & Savings Bank, 255 Ill. App. 250, affirmed 342 Ill. 342, 174 N.E. 368, and Matteawan Mfg. Co. v. Chemical Bank & Trust Co., 244 App.Div. 404, 279 N.Y.S. 495, 504.
 

 In the Matteawan case, supra, two checks were converted. • The diversion of the proceeds resulted from the act of a thief who was an employee of a firm of stockbrokers. The first check was drawn on one bank to the order of another bank by the plaintiff. The thief presented the check to the defendant and instead of depositing it to the plaintiff’s account filled out a- deposit slip to the credit of Midnight Mission, which also-had an account there. The thief drew out the amount signing the check as an officer of Mission. The plaintiff recovered judgment for the amount against the defendant payee bank. In the course of the opinion the court stated: “A check drawn to the order of the Chemical Bank on itself conveys nothing to it as payee as to the disposition of the funds, and inquiry must be made elsewhere. This inquiry, of course, must take the form of securing instructions from plaintiff’s duly authorized agents. No inquiry was made in this case. Whether the Chemical Bank was warranted in acting on the instructions of the deposit slip of the Mission which, of course, was not the payee of the check, can admit of but one answer, namely, that no such reliance was justified.” The court cited the Sims case, discussed heretofore.
 

 The court further stated, 279 N.Y.S., page 507: “The situation presented in the case then, after analysis, is a very simple
 
 *271
 
 one in which -a bank, having come into possession of funds, and having received no proper instructions as to their disposition, gives the money to a depositor not entitled thereto. This is a plain though innocent conversion for which the bank is obviously liable and we think that the bank is equally liable to the plaintiff on both checks, and that judgment should' be directed accordingly.”
 

 In American Jurisprudence, Vol. 7, page 378 — Verbo, Banks, the following is set forth: “It is also generally held that a check or draft drawn to the order of a bank precludes the diversion of the proceeds of the check or draft to a use other than that of the drawer, and that such diversion can be justified only by proof of authority from the drawer.” The cases of Bristol Knife Co. v. First Nat. Bank, 41 Conn. 421, 19 Am.Rep. 517; Bjorgo v. First Nat. Bank, 127 Minn. 105, 149 N.W. 3, L.R.A. 1915B, 287 and Robbins v. Passaic Nat. Bank & Trust Co., 109 N.J.L. 250, 160 A. 418, 82 A.L.R. 1368 are cited.
 

 82 A.L.R., page 1372 — Annotation under the heading of “Liability of bank which diverts checks or drafts drawn to its order to a use other than that of the drawer.” “It is generally held that a check or draft drawn to the order of a bank precludes the diversion of the proceeds of the check or draft to a use other than that of the drawer, and that such diversion can be justified only by proof of authority from the drawer. Bristol Knife Co. v. First National Bank (1874), 41 Conn. 421, 19 Am.Rep. 517; Graham v. Southington Bank & Trust Co. (1923), 99 Conn. 494, 121 A. 812; Bjorgo v. First Nat. Bank (1914), 127 Minn. 105, 149 N.W. 3, L.R.A. 1915B, 287; Robbins v. Passaic Nat. Bank & Trust Co. [109 N.J.L. 250, 160 A. 418, 82 A.L.R. 1368]; Sims v. United States Trust Co. (1886), 103 N.Y. 472, 9 N.E. 605.”
 

 82 A.L.R., page 1373 et seq. — “And in Graham v. Southington Bank & Trust Co. (1923), 99 Conn. 494, 121 A. 812, where the plaintiff drew a check on one bank in which he had a deposit payable to the order of another bank, with an idea of depositing it in the latter, and gave to his auditor and head of the accounting department authority only to deposit the check in the drawee bank, it was held that the drawee bank was liable where the agent did not deposit the check to the drawer’s account, but personally indorsed it, and presented it to the drawee representing that the drawer had directed him to get cash for payroll use, and the defendant accepted the agent’s statement, and, without making any
 
 investigation,
 
 paid the money to the agent, and it appeared that the agent had never secured money from the defendant bank except upon checks of his employer made payable to the agent. The court stated that the checks drawn payable to the defendant bank were, not of the same import as checks drawn to ‘drawer’, or to ‘cash’, and that such checks did not clothe the holder or bearer of them with apparent authority to convert them
 
 *273
 
 into cash and take the cash into his own custody; that when the agent presented himself at the defendant bank with the check payable to such bank’s order, and the bank received it, it became custodian of the funds subject to the plaintiff’s direction in ■respect thereof, and if it failed to keep the funds represented by the check on deposit subject to the plaintiff’s order, it must justify its conduct because of direction which it received from the drawer; that; if the agent assumed to convey directions from the plaintiff authorizing the defendant to pay over the funds, and it followed such directions assuming that they were in fact given by the plaintiff, and did not investigate their truth, it did so at the peril of discovering that the plaintiff never gave such directions, and thereby subjecting- itself to liability for the funds misapplied.” “And in Bjorgo v. First Nat. Bank (1914), 127 Minn. 105, 149 N.W. 3, L.R.A. 1915B, 287, it was ¡held that the fact that a bank draft issued by a small village bank was made payable to the order of the defendant bank was sufficient to put the defendant bank on inquiry as to the ownership of the proceeds, before paying them to the person presenting the draft; the court stating that the fact that the draft was payable to the bank, instead of to the person presenting it, was so out of the ordinary mode of doing business if such person was entitled to- the proceeds, that it placed the duty upon the bank to take some precautions before paying out the money.”
 

 In Bristol Knife Co. v. First Nat. Bank, 1874, 41 Conn. 421, 19 Am.Rep. 517, where the plaintiff, a business concern having an account in a bank, was held entitled to recover from the bank the amount of a check of a third person which it had indorsed to the order of the cashier, and sent in an envelop by a messenger, who broke open the envelope and obtained cash therefor from the bank, having presented it for payment with the statement that the plaintiff wished money to pay employees, 82 A.L.R. 1373, the court said: “If then, we look at the act of the plaintiffs, without reference to what the messenger wrongfully assumed, we find that all the plaintiffs did was to indorse the check payable to the -order of the cashier, and put it, together with a deposit ticket, in a sealed envelop, and hand it to the messenger to carry to the. bank and have it credited, and bring home the bank 'book. These acts of the plaintiffs do not, it seems to us, imply any authority in the messenger to collect the money on the check. If the sealed envelop, containing the check and deposit ticket, had been presented to the bank in the same shape as delivered to the messenger, it would have been clear that only a deposit was intended. It may be suggested that the presentation by the messenger of the naked ohe-ck at the bank ought to- be considered as authorized by the principal for the purpose of fixing the liability. We do- not so regard it. Suppose the envelope had inclosed a written request, relative to the matter, intended for presentation to the
 
 *275
 
 cashier, and the messenger had broken the seal and destroyed the writing, and had presented the check by itself, would we judge the principal in such case simply by the fact that the special agent was authorized to present the check? If so there would be no safety in employing a messenger to do the simplest errand. But if we concede, for the sake of argument, that the authority given to the messenger was to present the check by itself to the bank, we do not think an authority to receive the money can fairly be implied under the circumstances of this case. The circumstances here do not enlarge the apparent scope of the agent’s authority, but greatly contract it.
 
 The form of indorsement, ‘Pay to the order of the cashier’, was unnatural, if the plaintiffs intended to have the bank pay the money to the messenger.
 
 The object of this special indorsement was, undoubtedly, to prevent the bank from paying the check to anyone except the plaintiffs, and everybody, except the bank itself, would be precluded from collecting it in that form; and, under such circumstances, we think the presentation of this check at the bank, by a perfect stranger, who called for the currency on it, ought to have aroused suspicion. It would seem impossible, when the currency was called for, to suppress doubts and inquiries, like the following:. Why did not the plaintiffs indorse the check payable to bearer, or to the order of the messenger ? or, why did they not send a check to draw the amount? or why did they not send an accompanying letter of explanation ? And suppose there had been an indorsement by the plaintiffs to pay this check to the bearer, or to this messenger by name. In such case, though it would have been legally safe to have paid the money to this messenger, yet, would not common prejudice require the officers of the bank to request that some person known to the bank should identify the bearer, who was a perfect stranger to them? In this ’case, though the bank was trusting a stranger at their own peril, yet they required no evidence of his authority, except the possession of the check and his verbal statement, corroborated, in the opinion of the cashier, by some personal and family-resemblance which he bore to the treasurer of the plaintiffs. Again, it is found by the court that the payment of the money on a check indorsed like this was not the ordinary way of issuing such checks, as between banks and persons having deposit accounts with them, but that the regular course was for the bank to credit the checks to the account of the other party, who obtained the avails by drawing their own-checks on the bank.”
 

 In Main Belting Co. v. Corn Exchange Nat. Bank & Trust Co., 325 Pa. 168, 188 A. 865, 867, the plaintiff, a depositor, brought assumpsit against its bank of deposit for the amount of its checks alleged to have been wrongfully paid by the bank. Forty-five checks were involved, some were signed by plaintiff’s president and others by its treasurer, Smith. Some of the checks were
 
 *277
 
 drawn by plaintiff on the defendant and to the defendant’s order, and some were drawn to the order of defendant on plaintiff’s account with another bank, the Integrity Trust Co. All of the checks were presented to the defendant’s teller by Smith who used the cash and absconded. Plaintiff contended that the checks drawn on defendant were not paid according to their terms, and that the proceeds of those drawn on the Integrity Trust Co. were misapplied by defendant; that in each instance plaintiff’s accounts were charged with the payments made to Smith in violation of the-contract governing the relation of banker and depositor. The principal question was whether the bank was authorized to pay cash to Smith on the checks.
 

 Although in this case the words “Draft Hiller” or words of similar import were on the checks, there had been previous dealings between the parties. The court said: “The contract between the bank and the plaintiff required the bank to pay plaintiff’s checks to the payee designated 'by the plaintiff and to no one else, save on the order of the payee. United Security Life Insurance & Trust Co. v. Central National Bank, 185 Pa. 586, 40 A. 97, and cases following it. (N. B. Payee’s name was forged in that case.) The defendant, who was the payee, could therefore apply the proceeds only for the purposes designated by the drawer.”
 

 In defense, the bank alleged that it was and is usual and customary to draw checks,'' the payment of which in cash is desired by the drawer, to the order of the bank upon which such checks are drawn. The court noted that this would apply only to the checks drawn on plaintiff’s account with defendant and not to those drawn on the account in the Integrity Trust Co.
 

 The court said: “The same general rule of construction applies to this contract that is applied to others; the court must find what the parties meant by the words used to express their intention in the light of the surrounding circumstances. There is no averment that plaintiff had notice, prior to Smith’s embezzlement, of the alleged usage or custom, or that it was operative in con-’ ditions in which plaintiff should have known of it. If plaintiff’s checks should be considered subject to it, the usage or custom is unreasonable and must be condemned. Compare Dempsey v. Dobson, 184 Pa. 588, 39 A. 493, 40 L.R.A. 550, 63 Am. St.Rep. 809; Cameron v. Carnegie Trust Co., 292 Pa. 114, 140 A. 768. The manner in which Smith was able to use these checks without earlier discovery illustrates its unreasonableness. The checks drawn on defendant show that they were not indorsed either by the payee or by Smith. On their return to plaintiff for vouching, without indorsements, the plaintiff would find nothing on them to show who had received or what had become' of the proceeds directed bv the checks to be paid
 
 to■
 
 defendant. * * *. Smith destroyed nothing and made no reports; the checks on which
 
 *279
 
 he obtained cash were there, but an examination of them would not show that Smith had obtained the cash. A practice so readily susceptible of fraudulent use without the probability of detection is unreasonable." This is a strong case since there had been previous dealings between the parties, the court held that nevertheless the bank should have inquired as to what to do with the proceeds of the. checks.
 

 Defendant contended that the transactions came within Sections 5 and 8 of the Uniform Fiduciaries Act, 20 P.S.Pa. §§ 3371, 3392; that there was no evidence of bad faith. The court in refuting these contentions said: “Defendant had agreed to disburse plaintiff’s funds ‘upon and according to the check’ of the plaintiff; the obligation is -clear; the defendant has not performed; it is immaterial that it did not know and had no reason to suspect that Smith was an embezzler; if it had paid ‘according to the c-heclc,’ Smith could not have received the money from the teller on these checks. That checks are made payable to a bank when it is desired to transfer funds to it from another bank, or to purchase a draft or pay a debt due the bank, is perhaps common enough,
 
 but if a bank with the limited authority shozvn in this record treats such a check as payable to bearer, it takes the risk.
 
 As to the checks drawn on plaintiff’s account in the Integrity Trust Company to the defendant’s order, defendant was in fact a mere agent to collect for plaintiff and hold the proceeds for plaintiff’s account. Not having account to plaintiff, it is answerable in this suit.” (Italics ours.)
 

 In Deposit Guaranty Bank & Trust Co. v. Luke, 174 Miss. 98, 164 So. 30, 33, the court said: “We are of the opinion, therefore, that the bank obeyed the instructions and intentions of the drawers of the checks in placing the same to the credit of the Founders’ Syndicate. Of course,, if the words ‘A/c Founders Syndicate’ had been omitted from the check, and there had been no instructions to the bank, it would have been the duty of the bank to hold the funds as trustee and debtor of the drawers of the checks.”
 

 The Sims case has been followed consistently. It is quoted and relied upon in New Jersey National Bank & Trust Co. v. Sachs, 3 Cir., 1937, 91 F.2d 533.
 

 None of the cases cited by the defendant involves similar factual situations as the one presented herein. In all of the cited cases we find circumstances and previous dealings that bring them out of the general rule. In Armstrong v. American Exch. Nat. Bank, 1884, 133 U.S. 433, 10 S.Ct. 450, 33 L.Ed. 747, so strongly relied on by the defendant, the previous dealings of the parties and the surrounding circumstances were such that the Bank was justified in believing the holder was the owner of the draft.
 

 From a review of the jurisprudence of this state it appears that the articles of
 
 *281
 
 the Civil Code dealing with deposit have often been applied in controversies over money deposited in banks. These articles of the Civil Code are in accord with a general rule laid down in other states, heretofore stated, except the articles of the Code relating to the return of the specific thing deposited. In some of the decisions the deposit of money in a bank where, it is to be intermingled is referred to as irregular deposits. In other and more recent decisions the deposit of money in a bank to be intermingled with the general funds is held to create the relationship of creditor and debtor. Since the articles of the Code dealing with deposits are based on contract it would appear that the parties could modify their contract by not requiring the return of the specific thing. It being the custom of banks to mingle the deposited money with their general funds and remit by means of checks, etc., a depositor without instructions to the contrary impliedly agrees that the specific thing is not to 'be returned but an equal value thereof. Since the plea of prescription raises the question of whether a contractual relationship existed, we will refer to the decisions bearing out this conclusion in passing on the plea of- prescription in order to avoid repetition.
 

 The defendant’s plea of prescription is based on the ground that the plaintiff’s action is one in tort and since more than one year has elapsed that the right of action has prescribed.
 

 From a mere reading of the plaintiff’s petition, it is apparent that it seeks to recover under contract. In the case of Haas et al. v. Opelousas-St. Landry Bank
 
 &
 
 Trust Company, 9 La.App. 166, 119 So.
 
 372, 373,
 
 certiorari denied by this Court, 167 La. 537, 119 So. 700, the court stated:
 

 “The implied agreement between a bank and its depositors, in our opinion, is not prompted altogether by altruistic motives on either side. The depositor is relieved of the burden of holding his funds to insure their safe-keeping, and he enjoys at the same time the convenience of drawing upon the same in such amounts and at such times as he may wish, and in some instances by special agreement he additionally receives interest on his daily balances. The bank or depositary, on the other hand, uses these funds, and it derives revenue therefrom in making loans and discounts. The benefits, therefore, in the implied agreement between the depositor and depositary, may be said to be mutual.
 

 “It was held in Clason & Co. v. New Orleans, 46 La.Ann. 1, 14 So. 306, where the sole question related to taxation, that the relation between the depositor and the bank is that of creditor and debtor. But that must be taken in the sense that every depositor is the creditor of the depositary to the extent that the latter owes the former the duty of returning the thing deposited, or its equivalent. The Civil Code provides that the depositary is bound to use the same diligence in preserving the deposit that he
 
 *283
 
 uses in preserving his own property.
 
 It must also be observed that, although the depositary does not become the owner of the thing deposited, it is equally true that a bank receiving money on deposit is entitled to use that money iinder such restrictions as CM'e provided for in the banking laws of the country, or else it could not earn revenue sufficient to maintain its exis
 
 tence(Italics ours.)
 

 Young v. Teutonia Bank & Trust Co., 135 La. 66, 64 So. 984— Syl.: “The custom 'of banks is to mingle money collected by them for account of others with their general funds, and to -remit by means of their ■own checks, and those who deal with them ■are presumed to know the custom and to intend to abide by it, unless the paper forwarded for collection is accompanied by •Special instruction to the contrary. In the -absence of such instructions, the forwarding 'bank becomes the ordinary creditor of the collecting bank, and has no right to be paid by preference from the funds on hand at the time of its insolvency.”
 

 In the case of Hibernia Nat. Bank in New Orleans v. National Bank of Commere in New Orleans, 204 La.
 
 777,
 
 16 So.2d 352, 357, it is stated:. “The deposit of a check or money in a bank creates the relation of debtor and creditor and that relation is a voluntary one which can be established .only by contract or by the will of the depositor.. This rule, based on universal jurisprudence, is set forth in 3 Ruling Case Law,'Banks, sec. 183, p. 556, thus: ‘Ordinarily, depositing money in a bank creates between the bank and the person credited therewith the relation of debtor and creditor. It is a contract relation which cannot be created without the consent or acquiescence of both parties.’ ” See also Daugherty v. Canal Bank & Trust Co., 180 La. 1003, 158 So. 366; McGaw v. Canal Bank & Trust Co. et al., 172 La. 898, 135 So. 670.
 

 In the case of Kramer v. Freeman, 198 La. 244, 3 So.2d 609, 611, wherein a husband sued his wife and mother-in-law for certain items allegedly stolen from him, the husband asked for a judgment condemning the defendants to return the cash and jewelry taken from him and in the alternative for a money judgment for the value of the items so taken. The defendants filed a plea of prescription based on the ground that the action was in ex delicto and had prescribed in one year. The court in reversing the judgment of the district-court held that the action was ex contractu and overruled the plea of prescription. In passing on this question, this Court said: “There can be no doubt that the acts complained of were offenses within the meaning of Article 2315 of the Civil Code and that the plaintiff had a cause of action to recover all of the damages he suffered as a result of these torts. In addition to this, -the- wrongful taking and detention of plaintiff’s property- by the defendants imposed ■upon them -an -implied contractual obligation to return it and the plaintiff had the
 
 *285
 
 right to proceed in an action ex contractu to compel them to do so.” See long list of articles and cases cited. The court pointed out that in order .to obtain relief ex contractu, it must plainly appear, if plaintiff is to avoid the 'prescription of one year, that he has elected to waive his cause of action in damages for the offenses committed by the defendants and is seeking restitution of his property. “It is the well settled jurisprudence of this State that the character which a plaintiff gives his pleadings and the form of his action govern the prescription applicable.” Citing cases.
 

 In the Kramer case the plaintiff specifically prayed for the return of the specific property or in the alternative the value thereof. The plea of prescription is not "well founded and must be denied.
 

 The defendant contends that where one or two innocent parties must suffer loss through the fraud of another that the burden of the loss should be imposed on him who most contributed to it. The position is taken that the plaintiff by issuing The check payable to the bank instead of the University made it possible for the funds to be converted and that the plaintiff should thereby bear the burden of the loss. It appears from the testimony that the University carried a large-account with the plaintiff bank and had secured many loans from the plaintiff previous to this transaction. It also appears that the only one authorized to draw checks against the funds of the University was C. M. Johnson, the auditor of the University at that time and now Secretary of the Louisiana Tax Commission. It appears that at no time were any of the funds withdrawn by Smith. These facts are established by the testimony of the officials of the bank and C. M. Johnson. There is nothing in the record to contradict their testimony in this respect. At the time that the check was issued the plaintiff had a small deposit account with the defendant bank. If the funds had been deposited to the plaintiff’s account, they could not have been withdrawn by Smith or anyone else without authority from the plaintiff. In light of the numerous decisions quoted above, the plaintiff bank amply protected itself by making the check payable to the defendant bank who could not disperse the funds without instructions or authority from the plaintiff. The funds could not have been converted if the defendant bank had not turned them over to Brown without authority.
 

 The defendant contends that banks receiving checks payable to themselves, do not, customarily, inquire of the drawer what the purpose or intention is as to the disposition of the funds represented by such checks. The defendant attempted to prove that it was customary for banks receiving checks payable to themselves to dispose of the proceeds on the direction of the person presenting the check. The
 
 evi-J
 
 dence is very indefinite and unsatisfactory. On analysis, it appears that sufficient in
 
 *287
 
 formation as to ownership of the funds was present in each transaction and in no instance was the funds dispersed to the wrong person. No attempt was made to prove that Brown owned the check or was entitled to the proceeds of it. There is no evidence to show that Brown made any claim, of title to the check or any representation to that effect. Be that as it may, if such a custom prevailed it would have to be condemned and could not supplant the universal rule of law governing transactions of this nature recognized by many of the courts throughout the states, some of which have been referred to in this opinion.
 

 The defendant contends that the check is payable to a fictitious payee and was intended to be a check payable to bearer. He cites a number of authorities to support his contention. We have examined all the authorities and find that they are not applicable. They are all based on the proposition that the drawee was not intended by the maker to have any interest in or entitled to the proceeds of the check. There is no evidence in this record to support any such conclusion and the defendant did not treat it as such because the defendant bank indorsed the check and collected the money from the Hibernia Bank.
 

 The plaintiff is only entitled to interest from the date of demand. It appears that the first.demand was made by the filing of the suit.. Article 2948, Civil Code; Liquidation of Canal Bank & Trust Company, 211 La. 803, 30 So.2d 841.
 

 For the reasons assigned, the judgment of the lower court is reversed and set aside. It is now ordered that there be judgment in favor of the plaintiff City National Bank of Baton Rouge, and against the defendant, Louisiana Savings Bank & Trust Co., in the sum of $100,000.00, with legal interest from April 24, 1943 until paid. All costs to be paid by the defendant.